PREFORMED LINE PRODUCTS COMPANY, Plaintiff,

v.

The FANNER MANUFACTURING COMPANY, Defendant.

Civ. A. No. 33196.

United States District Court
N. D. Ohio, E. D.

Jan. 6, 1960.

Supplemental Findings and Conclusions
May 17, 1962.

764

Richard F. Stevens, J. Richard Hamilton, Baker, Hostetler & Patterson, Cleveland, Ohio, Patrick H. Hume, Henry L. Brinks, Byron, Hume, Groen & Clement, Chicago, Ill., for plaintiff.

William C. McCoy, Sr., William C. McCoy, Jr., McCoy, Greene & TeGrotenhuis, Cleveland, Ohio, Timothy F. McMahon, Thompson, Hine & Flory, Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

Thomas F. Peterson is the President and principal stockholder of Preformed Line Products Company (an Ohio corporation), plaintiff in this action. Peterson is an electrical engineer, and in 1936,

while employed by The American Steel & Wire Company, at Worcester, Massachusetts, he filed an application for Patent No. 2275019 (hereinafter Patent No. 1), which issued on March 3, 1942. At the time the patent issued, Peterson was Manager of the Electrical Products Division of The American Steel & Wire Company, at Cleveland, Ohio.

In 1943 Peterson made arrangements with The Fanner Manufacturing Company (also an Ohio corporation) to manufacture the preformed helical elements which, in combination with an electrical cable, constitute the invention of Patent No. 1.

In 1944 Peterson granted Fanner a non-exclusive license to make and sell the devices described in the patent. Subsequently additional licenses were granted by Peterson to The Cleveland Wire & Spring Company and The Ervine Manufacturing Company. However, for several years, Fanner continued to be the sole manufacturer of helical preformed armor rods under Patent No. 1 for Peterson's employer, The American Steel & Wire Company.

The No. 1 patent is the basic patent for helical preformed reinforcements used in combination with line conductors. Generally, the claims of Patent No. 1 define a preformed open helix, having a pitch length several times its diameter and capable of substantial elastic deformation manually whereby it may be laid sidewise against the conductor and wrapped therearound without permanent deformation of the helix, the inside diameter of the helix being substantially equal to the outside diameter of the conductor.

Although the specifications and claims of the patent are silent on the subject, the drawings show helical reinforcements with a hand of lay (direction of twist) of the helix in the same direction as the hand of lay of the strands of the conductor and also a lay in the opposite direction. The armor rods (reinforcements) manufactured by Fanner under the patent were made on specifications furnished by The American Steel & Wire Company under the supervision of Peterson. The armor rods were formed into helical configurations having an internal diameter slightly smaller than the external diameter of the cable.

At the outset the armor rods manufactured by Fanner had a hand of lay opposite to that of the strands of the cable. Later, as the stranded conductor, known in the trade as A.C.S.R., came into more general use, the hand of lay of the helix was changed to conform to the direction of lay of the strands of the cable.

On June 23, 1945 Peterson filed his patent application No. 601245, which matured into Patent No. 2587516 (hereinafter Patent No. 2) under date of February 26, 1952.

Nine claims are recited in Patent No. 2, which defines an invention consisting generally of a combination of a stranded conductor and preformed helices with a pitch and direction of lay "substantially the same as" the pitch and direction of lay of the strands of the cable and having a diameter less than the outside diameter of the stranded cable.

On September 1, 1947, effective January 1st of that year, Peterson granted Fanner a non-exclusive license under both Patent No. 1 and Application No. 601245.

In August 1947 Preformed Line Products was incorporated and became licensed in September 1947 under Patent No. 1 and the pending application for Patent No. 2.

Although Peterson was the moving spirit in the organization of Preformed Line Products, he continued his full time employment with The American Steel & Wire Company until 1950, and was a salaried consultant of that company thereafter until 1956.

On April 27, 1948 Peterson filed an application which matured as Patent No. 2609653 (hereinafter Patent No. 3) on September 9, 1952. Patent No. 3 contains but two claims and differs from Patent No. 2 in that the helical convolutions therein described have a pitch length "slightly less" than the pitch length of the strands of the conductor.

Meanwhile, on September 20, 1946, Patent Application No. 698312 was filed by Peterson. That part of the application which related to dead ends was divided, and in December 1955 the dead end application was filed. Patent No. 2761273 (hereinafter Patent No. 4) issued on that application on September 4, 1956.

In 1940 Jesse C. Little, an electrical engineer, became an employee of The American Steel & Wire Company, at Cleveland, Ohio. Little assisted in the establishment of the Vibration Fatigue Laboratory of the company and was active in making and supervising laboratory tests of the helical elements described in the above mentioned patents. Little left his employment with The American Steel & Wire Company in 1950 and became associated with Preformed Line Products as an employee and shareholder. In March 1954 Little sold his stock interest in and severed his employment with Preformed Line Products. In September 1954 he became an employee of defendant Fanner Manufacturing Company and is presently employed by that company.

In 1948 Fanner ceased manufacturing and selling armor rods. Beginning in 1953 defendant resumed the manufacture and sale of such items and a few years later engaged in the manufacture and sale of dead ends. Defendant paid to plaintiff royalties in the approximate amount of $125,000 on all armor rods manufactured and sold by it. Defendant also tendered to plaintiff royalties on dead ends which it manufactured and sold. Plaintiff, however, refused to accept the latter royalties.

## THE PLEADINGS

In its complaint plaintiff alleges that defendant infringed Patents Nos. 3 and 4 and that defendant engaged in unfair competition with plaintiff. The prayer is for injunctive relief, an accounting and damages.

In its Amended Answer and Counterclaim defendant challenges the validity of Patents Nos. 3 and 4; denies infringement and avers that by its acceptance of royalties plaintiff is estopped to assert Patents No. 3 and No. 4 against defendant. As a further defense, defendant avers that it has the right under its license to make and sell any of the products disclosed in Patents Nos. 3 and 4. Defendant alleges that plaintiff has misused the patents in suit; has engaged in unfair competition with defendant and that plaintiff has violated the antitrust laws of the United States.

Thus, the issues are:
1. The validity of Patents No. 3 and 4.
2. Infringement of said patents.
3. Whether defendant competed unfairly with plaintiff.
4. Estoppel and implied license.
5. Misuse of the patents.
6. Violation of the antitrust laws.

## IS PATENT NO. 3 VALID?

Defendant contends that the invention described in Patent No. 3 was in public use and on sale more than one year before the application for the patent was filed on April 27, 1948. In support of such contention defendant relies largely upon oral testimony and an exhibit which, together, show that on September 27, 1946 Edward Schane, Chief Engineer of Fanner, received specifications from The American Steel & Wire Company, or Peterson, setting forth the pitch lengths of the various types of helical reinforcements to be manufactured by Fanner. Thereafter Fanner manufactured armor rods in accordance with such specifications. The diameter dimensions of the cables were also set out in the specifications but no reference was made therein to the pitch length of the cables. Defendant contends, however, that the preferred pitch length of the cables under standards set up by the American Society for Testing Materials is 13 times the diameter and that the application of such formula discloses the pitch length of the cables to be greater than the prescribed pitch length of the reinforcements. It appears, however, that the A.S.T.M. standards were not adopted until 1948,

which, of course, was later than the critical period of alleged prior use. Moreover, defendant's witness, J. C. Little, testified that in 1945–1946: "We were not always or in fact never sure or certain of the lay lengths which were going to be on the strands on which they (the reinforcements) were to be applied." The claims of the patent describe a combination of a cable and a helical reinforcing device. In order to establish prior public use of the invention it was necessary to show the use, prior to April 28, 1947, of a reinforcing device in combination with a cable in which the former had a shorter pitch length than the latter. The defendant was unable to submit such proof.

■■ It is the teaching of the cases that prior public use must be established by evidence that is so clear, convincing and cogent as to admit of no reasonable doubt. Interurban Ry. & Terminal Co. v. Westinghouse Electrical & Mfg. Co., 186 F. 166, 169 (6th Cir.); Zachos v. Sherwin Williams Co., 177 F.2d 762, 763 (5 Cir.); Fraser, et al. v. Williams, D. C., 61 F.Supp. 763; Austin Machinery Co. v. Buckeye Traction Ditcher Co., 13 F.2d 697, 700 (6th Cir.). Defendant has not sustained the burden of proof on this issue.

■ Defendant contends also that the No. 3 patent lacks adequate disclosure. This contention rests almost entirely upon the alleged indefiniteness of the term "slightly less" as used in the claims of the patent. There is a difference of opinion among the witnesses as to the meaning of "slightly less" but such divergence of views is hardly enough to warrant the invalidation of the patent on that ground alone. *Compare*: General Electric Supply Corp. v. Maytag Corp., 100 F.2d 218, 223 (8 Cir.). Considering the nature of the invention, it is difficult to perceive wherein the patentee could have used a more precise term to describe the pitch length of the reinforcement in relation to that of the strands of a conductor. In Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, at p. 66, 43 S.Ct. 322, at 329, 67 L.Ed. 523, it was

contended that the word "substantial" was so indefinite as to render the patent void. In answering this argument, the court said:

"* * * Expressions quite as indefinite as 'high' and 'substantial' in describing an invention or discovery in patent specifications and claims have been recognized by this Court as sufficient. In Tilghman v. Proctor, 102 U.S. 707 [26 L.Ed. 279], the claim sustained was for 'the manufacturing of fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure.' See also Rubber Co. v. Goodyear, 9 Wall. 788, 794 [19 L.Ed. 566]; Mowry v. Whitney, 14 Wall. 620, 629 [20 L.Ed. 860]; Lawther v. Hamilton, 124 U.S. 1, 9 [8 S.Ct. 342, 31 L.Ed. 325]; Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 436 [22 S.Ct. 698, 46 L.Ed. 968]; Abercrombie & Fitch Co. v. Baldwin, 245 U.S. 198, 205 [38 S.Ct. 104, 62 L.Ed. 240]."

It seems reasonable to conclude that persons skilled in the art would understand the meaning of "slightly less" when that term is read in the full context of the claims and considered in the light of the prior art.

Defendant claims also that Patent No. 3 does not disclose invention. This defense rests upon two grounds—(1) that Patent No. 3 discloses no invention over the prior art; (2) that the claims of Patent No. 3 disclose no invention over and above the claims of Patent No. 2, which issued on a co-pending application of the patentee.

(1) As anticipations, defendant relies upon Peterson's Patent No. 1, Sherman No. 2172810, Selquist No. 2202538.

■ The above prior patents were cited by the Patent Office during the prosecution of the application. It is well established that citations by the Patent Office of pertinent prior art adds weight to the statutory presumption of validity. Cold Metal Process Co. v. Republic Steel

Co., 233 F.2d 828, 837 (6th Cir.); Southern States Equipment Corp. v. U. S. C. O. Power Equipment Co., 209 F.2d 111, 118 (5 Cir.). Defendant also cites and relies upon a publication authored by J. C. Little and Thomas F. Peterson entitled "Conductor Reinforcements," which was read by Little at a conference of the Missouri Valley Electrical Association on April 17, 1947 and copies thereof distributed to the membership of the Association. Defendant cites the following portion of the publication as anticipating the shorter pitch length of Patent No. 3:

> "Basically P. F. T. armor rods consist of hard-spring-type wires preformed as helices with a pitch length which is eight to ten times that of the conductor or strand, etc. * *."

The publication indicates no preference between the same or opposite lay and makes no reference to the pitch length of the conductor strands. Defendant attempts to supply this latter deficiency by oral testimony relating to the general range of pitch lengths of cables at the time in question. It is well settled, however, that critical omissions in a prior publication cannot be supplied by oral proof. Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986 (2 Cir.). See also: Lincoln Stores v. Nashua Mfg. Co., 157 F.2d 154 (1 Cir.).

(2) The application for Patent No. 2 filed on June 12, 1945 was co-pending with the application for Patent No. 3 from the filing date of the latter on April 27, 1948 until the patent issued on the former in February 1952.

Because the application for Patent No. 2 was not disclosed to the public at the time the application for Patent No. 3 was filed, the former application cannot be considered as prior art. However, where two patents issue to the same inventor on his co-pending applications, the claims of the later patent cannot be sustained as valid unless they disclose invention over the claims as distinguished from the disclosures of the earlier grant. In re Sherman, 121 F.2d 527, 28 CCPA 1329; In re Land, 109 F.2d 246, 27 CCPA 863; Weatherhead Co. v. Drill Masters Supply Co., et al., 227 F.2d 98 (7 Cir.); S. H. Kress & Co. v. Aghnides, 246 F.2d 718, 726 (4 Cir.).

Both Patents Nos. 2 and 3 provide for a direction of lay the same or substantially the same as the lay of the strands of the cable. In all but three of the nine claims of Patent No. 2 the pitch length of the helical reinforcements is described as being "substantially the same as" the pitch length of the strands. In Claim No. 3 of Patent No. 2 the pitch length of the reinforcement is described as "substantially corresponding to the pitch length of the strands of the cable." Only in Claim No. 2 of Patent No. 2 is the pitch length of the helical reinforcements defined as "the same" as the pitch length of the strands. Claim No. 3 of Patent No. 2 and Claim No. 1 of Patent No. 3 appear in the margin.[1]

---

1. *Claim of Patent No. 2*
"3. In combination, a stranded cable, a plurality of elongated resilient reinforcing elements preformed into helical configurations of uniform pitch and diameter throughout their length surrounding a portion of said cable, said elements being distributed around said cable as regarded in right section in balanced relation, said elements having a preformed internal diameter smaller than the overall diameter of said cable and a direction of lay agreeing with that of said cable, the pitch length of said elements when positioned on said cable substantially corresponding to the pitch of the lay of the strands in the cable so as to tend to track with the latter throughout a major longitudinal extent of the surrounding portion of cable, and to change the track, if at all, by gradually rising from between two adjacent strands and crossing over to proximate strands at an angle differing but little from the pitch angle of the latter, whereby to effect line contact between the elements of the strands of the cable throughout the major part of their co-extensiveness."
*Claim 1 of Patent No. 3*
"1. In combination with a stranded line, a reinforcing and connecting device comprising a helically-preformed element hav-

The primary purpose of Patent No. 2 was to secure substantial correspondence between the angle and length of the pitch of the helical elements with the angle and length of lay of the strands of the conductor so that the helical elements would lie between and "track" with the adjacent strands of the conductor. It was conceived that by such arrangement the greatest line contact between the helical elements and the conductor strands would be realized and result in the highest frictional engagement between the two and provide the greatest area of contact for electrical purposes, thereby effecting a union of highest efficiency in their relationships. In actual use, however, the invention of Patent No. 2 failed to produce the superior results claimed for it. This was recognized by the inventor in his preamble to the disclosures of Patent No. 3, where he said:

"Notwithstanding the above desiderata, there is the fact that helices so preformed to this ideal pitch are subject to axial distortion when applied to stranded bodies working under tensional loads of relatively high values, as are encountered in overhead transmission, line assemblies and in other suspended strand constructions. The tendency is for the helical elements to be elongated so that their position between adjacent strands of the associated conductor is disarranged to the extent that they tend to pull out of the inter-strand groove and ride up over adjacent strands to positions which are less efficient in the matter of contact from both the electrical and mechanical viewpoints. As is well known, if a helix is stretched so as to increase its pitch length, its effective helical diameter is diminished. Therefore,

in the elongated condition of load, mentioned above, the helical element exerts its greatest constrictive effort in the new disarranged position, and thus tends to build up high unit stresses at points where it rides over the strands of the associated conductor. Such stresses may be of a magnitude sufficient to notch or indent the strands, as well as the helical elements themselves, to afford places of low resistance to fatigue. Having started from an ideal condition, then, the arrangement of an accurately preformed helix tracking in the inter-stranded grooves of a conductor must change for the worse, if it changes at all, so as to result in an electrical and mechanical bond that is inferior to that originally constituted."

The patentee then specified the objective of Patent No. 3 as follows:

"The present invention is aimed at curing these defects by providing for a helical element that is preformed with an angle of pitch that is less than the angle of lay of the associated stranded body, and with a pitch length that is less than the length of lay of the latter."

Thus, initially it was the objective of Patent No. 3 to cure the defects of the invention defined in Patent No. 2 by making the pitch lengths of the reinforcement "less" than the pitch lengths of the strands of the conductor. However, as allowed, the claims of Patent No. 3 define the pitch length of the reinforcement that is "slightly less" than the pitch length of the strands of the conductor. The issue to be determined therefore is whether the "slightly less" pitch lengths of the claims of Patent No. 3 are patentably distinguishable over the pitch lengths

---

ing helical convolutions for disposition around said stranded line, said convolutions being of the same hand as the strands in said line and being of substantially constant pitch length throughout said element, said pitch length being slightly less than the pitch length of the strands comprising said line when said element is initially positioned thereon,

said element being preformed to an internal diameter that is less than the overall diameter of said stranded line and being elastically expanded to accommodate the latter, said element having a sufficiently open pitch for introduction to the line from its side without exceeding the elastic limit of the material of which said element is made."

of the reinforcements as defined in the claims of Patent No. 2.

The claims of Patent No. 2 do not require exact or precise correspondence between the lengths of the pitches of the reinforcement and the strands. The phrases "substantially the same as" and "substantially corresponding to" imply clearly that something less than exact correspondence is required. The specifications of Patent No. 2 confirm this view.

"Although it is desirable that the pitch of the helix in which the reinforcing wires 20 are formed be the same as the pitch of the strands of the cable, the pitches may be at somewhat of a variance without materially impairing the effectiveness of the reinforcement." Patent No. 2, col. 4, lines 58–63.

Claim No. 3 of Patent No. 2 reads in part:

"* * * the pitch length of said elements when positioned on said cable substantially corresponding to the pitch lengths of the lay of the strands in the cable so as to tend to track with the latter * * *." Patent No. 2, Claim 3, lines 54–57.

Claim No. 3 of Patent No. 2 was first submitted as an amendment to the application on April 19, 1950. In urging the allowance of said claim before the Examiner, the patentee said:

"This is one of the more limited statements, reciting, as it does, the condition of conformance of pitch and lay on the one hand, and introducing on the other, the condition of near conformance explained in the specifications at p. 8 commencing with line 16 and running through line 26. In short, this claim covers the practical form, as distinguished from the theoretical ideal, and should be patentable for the many reasons mentioned herein and previously on this record." Ex. 36, p. 41.

The condition of "near conformance" and tendency to track as taught in Claim 3 of Patent No. 2 is achieved also by the "slightly less" pitch length of the reinforcement as provided in Patent No. 3.

It is stated in the specifications of Patent No. 3 that:

"By this construction * * * any change must, from this initial condition be for the better by virtue of the fact that the helical element comes more closely into a condition of tracking * * *." Patent No. 3, col. 4, lines 33–39.

During the prosecution of Patent No. 3 patentee's counsel stated to the Examiner that:

"* * * it was here proposed to provide the helically-preformed reinforcement with a sufficiently short pitch angle and pitch length in relation to the strands of the conductor to be capable of being stretched into inter-strand agreement with the latter if and when such reinforcement were deformed by the application of tensile pull under conditions of actual use." Ex. 1, p. 36.

At the time the last quoted representation was made the patentee was prosecuting an application for the allowance of claims defining pitch lengths of the reinforcements as "less" than the pitch of the strands of the conductor. There was nothing new in making pitch lengths of the helical elements shorter than the pitch length of the cable. As shown by the file wrapper of Patent No. 3, the Examiner repeatedly refused to allow claims limited only to a pitch length that was "less" than the pitch of the cable and cited Peterson No. 1, Selquist, Sherman and other patents as prior art and disclosing such shorter pitch lengths. It was only after a conference with the Examiner and the cancellation of all ten claims of the original application and the substitution therefor of claims for pitch lengths "slightly less" than the pitch lengths of the conductors that the application was approved. While the specifications of Patent No. 3 use the term "less" in referring to the relative pitch lengths of the reinforcement and the cable, such use cannot enlarge the mean-

ing of "slightly less" as used in the claims. Specifications may be looked to for the purpose of explaining any ambiguity in the claims or limiting their scope but specifications are not available to expand the claims. Walker on Patents, Deller Ed., Vol. 3, p. 1242, and cases cited therein. And, as said in Schriber-Schroth Co. v. Cleveland Trust Co. et al., 311 U.S. 211, 220, 61 S.Ct. 235, 239, 85 L.Ed. 132:

> "It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent."

See also Morgan Envelope Co. v. Albany Paper Co., 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500.

The term "slightly less" connotes a small or trivial shortening of the pitch length and does not exclude the least reduction in the length of the pitch of the reinforcement below that of the pitch of the conductor. The term "slightly less" includes those minimal deviations from precise conformance in the pitch lengths of the reinforcements and the strands as taught in Patent No. 2. The claims of each patent, therefore, read on the other, thus meeting one of the tests of double patenting. In re Stanley, 214 F.2d 151, 41 CCPA 956. Moreover, no good reason appears why, if allowable, the claims in Patent No. 3 could not have been included in Patent No. 2. See Sterling Varnish Co. v. Louis Allis Co., D.C., 145 F.Supp. 810, 816.

Patent No. 3 involved no new principle and represents no creative thought. It was the mere carrying forward of the original idea of Patent No. 2 to secure the ideal condition of "tracking" under conditions of actual use. As shown above, this same objective was sought to be accomplished by the practical form of "near conformance" as disclosed by Claim No. 3 of Patent No. 2. The conclusion is inescapable that the "near conform-

ance" of pitch lengths as taught in Patent No. 2 contemplates a pitch length of the reinforcement "slightly less" than the pitch of the strands of the conductor.

Quite apart from the foregoing considerations, the claims of Patent No. 3 do not disclose invention over those of Patent No. 2. A slight reduction in the pitch length of the reinforcement represents no more than the application of mechanical skill in the course of natural development of the art. Concrete Appliance Co. v. Gomery, et al., 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 713, 51 S.Ct. 232, 75 L.Ed. 634. The defective performance of the invention of Patent No. 2 under high tension loads was caused by the elongation of the pitch lengths of the reinforcements beyond the length of the strands of the conductor. To anyone skilled in the art, it would be obvious that a slight reduction in the pitch length of the helices would eliminate the defects. It is too firmly established to require citation of authority—that a mere change in degree, form or size—does not constitute invention nor do improvements that are the result of mechanical skill amount to invention. It does not appear that the invention described in the claims of Patent No. 3 is substantially different from that comprehended in Patent No. 2. The following statement of the court in Miller v. Eagle Mfg. Co., 151 U.S. 186, 198, 14 S.Ct. 310, 315, 38 L.Ed. 121, is in point:

> " * * * it must distinctly appear that the invention covered by the later patent was a separate invention, distinctly different and independent from that covered by the first patent; in other words, it must be something substantially different from that comprehended in the first patent. It must consist in something more than a mere distinction of the breadth or scope of the claims of each patent. * * * "

There is no need here to rely on the brighter light of retrospection to reach the conclusion that Patent No. 3 does

not constitute invention. As was said in Hobart Mfg. Co. v. Landers, Frary & Clark, D.C., 26 F.Supp. 198; Aff'd. per curiam 107 F.2d 106 (2 Cir.):

" * * * it is obvious that a mere difference or change in the mechanical construction in size or form of the thing used, in order to obviate known defects existing in the previous devices, although those changes are highly advantageous, and far better and more efficacious and convenient, does not make the improved device patentable. In order to be patentable, it must embody some new idea or principle not before known. It must be a discovery, as distinguished from mere mechanical skill or knowledge."

To the same effect is: Detroit Gasket & Mfg. Co. v. Victor Mfg. & Gasket Co., 114 F.2d 868 (7 Cir.); Pearson Sanding Machine Co. v. Williams Furniture Co., 132 F.2d 55 (4 Cir.).

Plaintiff cites and relies upon Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L. Ed. 523, as authority for the proposition that a change in the degree of pitch may be patentable if directed to a wholly different object than the prior art. That Eibel is an inapposite citation is readily apparent upon an examination of the opinion in that case. The pitch of the prior art in Eibel was described by the court as "trivial," the sole object of which was to secure the drainage of the stock. This was accomplished by a pitch of 2 or 3 inches. Eibel's pitch was directed to the entirely different object of increasing the speed of the stock to keep pace with the speed of the wire. To accomplish this Eibel raised his pitch to 12 inches and above and the higher pitch for this different purpose was at a different point in the paper-making machine than the lower pitch of the prior art.

It is true that Patent No. 2 and its objectives were referred to in the application for Patent No. 3 and that the Patent Office was informed of the disclosures of the former. It is likewise true that the Patent Office consistently requires inventive differences between the claims of co-pending applications.

In the light of these facts, it may well be that Patent No. 3 is entitled to a presumption of validity over Patent No. 2. However, such presumption is not conclusively binding on this Court, and, for the reasons stated above, I am of the opinion, and hold, that the presumption has been overcome and that the claims of Patent No. 3 do not disclose invention over and above Claim No. 3 and other claims of Patent No. 2 and that Patent No. 3 is invalid.

## INFRINGEMENT OF PATENT NO. 3

If, contrary to the above holding, Patent No. 3 is held ultimately to be valid, I am persuaded that in such event it would not be found that defendant infringed the patent. As shown above, claims defining the pitch length of the reinforcement as "less" than that of the strands of the cable were rejected by the Patent Office, after which the patentee cancelled such claims and substituted the allowed claims, defining the pitch length of the reinforcement as "slightly less" than the pitch length of the strands of the cable. Notwithstanding the Supreme Court's pronouncement in Schriber-Schroth Co. v. Cleveland Trust Co., supra, that—"claims allowed cannot by construction be read to cover what was thus eliminated from the patent"—plaintiff contends, in effect, that the term "less," which was eliminated from the claims, may, by construction be included therein. Plaintiff advances the argument that the claims of Patent No. 3 provide for a range of pitch lengths between upper and lower limits. According to plaintiff, the lower limit is defined in the last four lines of Claim No. 1, which read: "of sufficiently open pitch for introduction to the line from its side without exceeding the elastic limit of the material of which it is made." Plaintiff finds the upper limit of the supposed range of pitch lengths in the language of Claim No. 1, where the pitch length of the element is defined as "slightly less than the pitch length of the

strands comprising said line when said element is initially positioned thereon." (Lines 37–40 Claim No. 1.)

Mr. Sessions, the only disinterested witness who testified on the subject, took the view that the claims did not provide for such a range of pitch lengths but that the limitation inserted by the patentee in the claims to secure their allowance specifically requires the pitch length of the helical element to be "slightly less" than that of the strands of the conductor. Unquestionably Sessions' view is correct. Under the construction for which plaintiff contends, the pitch length of the helical element may be "less" or even "substantially less" than the strands of the line."when initially positioned thereon." Such construction enlarges the scope of the claims by the incorporation therein of the very term which was eliminated therefrom and renders meaningless the language included in the claims to secure the allowance of the patent. Obviously the terms "less" and "slightly less" do not define the same length of the pitch of the element in relation to the pitch of the strands of the conductor. Plaintiff's argument that the last four lines of Claim No. 1 define the lower limit of a range of pitch lengths is not persuasive. There is no showing that a helical element with a pitch length "slightly less" than that of the strands of the conductor when initially positioned thereon cannot be applied thereto without exceeding its elastic limits. Indeed it would appear that a longer pitch length only "slightly less" than that of the strands would more readily meet the requirements of the last four lines of the claim than a shorter pitch length which is "less" or "substantially less" than that of the strands of the cable. Plaintiff's argument is no more than a vain attempt to avoid the express limitation which the patentee inserted in the claims to secure their allowance.

Apparently doubting the soundness of the above argument, plaintiff advances the alternative contention that the term "slightly less" includes pitch lengths 50% shorter than the pitch lengths of the strands. Ruhlman, Vice President of plaintiff, testified, in effect, that "slightly less" includes pitch lengths 50% shorter than the strands of the cable. Both the argument and the testimony on which it rests must be rejected. That 50% less is substantially rather than slightly less is too obvious to require further comment.

Nor is plaintiff entitled to rely on the doctrine of equivalents. In addition to the rule laid down in Schriber-Schroth Co. v. Cleveland Trust Co., supra, plaintiff is bound by the somewhat broader principle consistently applied by the Sixth Circuit Court of Appeals. The principle, as stated in Lunati v. Barrett, 104 F.2d 313, 316 (6 Cir.), is:

"The claims in suit must be narrowly construed within the principle so often applied in this court that where claims define an element in terms of form, location, or function, thereby creating an express limitation, where that limitation pertains to the inventive step and imports a substantial function which the patentee considered of importance, the court cannot be permitted to say that other forms which the inventor thus declared not equivalent are so to be treated. D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 6 Cir., 259 F. 236, 240; Hollingshead Company v. Bassick Mfg. Co., 6 Cir., 73 F.2d 543, 548; Directoplate Corp. v. Donaldson Lithographing Co., 6 Cir., 51 F.2d 199, and our recent decision in Valjean v. Perfection Stove Co., 6 Cir., 103 F.2d 60. Whether our conclusion be based upon estoppel in patent office proceedings or upon a limitation voluntarily inserted in the claims to avoid prior art seems to us unimportant. The result in claim construction is the same."

See also: Midland Steel Products Co. v. Clark Equipment Co., 174 F.2d 541 (6 Cir.); Dow Chemical Co. v. Skinner, 197 F.2d 807 (6 Cir.); Parke-Davis & Co. v. American Cyanamid Co., 207 F.2d 571 (6 Cir.).

All cable reinforcements manufactured and sold by defendant have pitch lengths

that are "less than" the pitch lengths of the cables. Most of such reinforcements have pitch lengths considerably shorter than "slightly less" than the pitch lengths of the cables of association and do not infringe the patent. According to plaintiff, defendant's products show pitch lengths ranging from 61% to 96.2% of the pitch of the cables. The latter figure indicates the difference between the minimum standard pitch length of a 5/16th inch galvanized steel wire cable of 3.12 inches and the pitch of a helical reinforcement of 3 inches available for use in combination with such cable. The pitch lengths of such cables, however, range between the minimum of 3.12 inches and a maximum of 4.99 inches. The evidence does not show clearly whether defendant's reinforcement with a 3 inch pitch was used in combination with cables of the above minimum or maximum pitch lengths or with cables of pitch lengths somewhere between the upper and lower limits of the cable pitches mentioned above.

Similar situations exist with respect to other cables. Patent No. 3 defines a combination of cable and reinforcement. Defendant makes and sells only the reinforcement. In the state of the record it is impossible to determine whether defendant's products with pitch lengths "slightly less" than those of the cables were used in the patented combination. It may well be that defendant sold reinforcements knowing the same could be used for infringing as well as non-infringing purposes. However, even if such were the fact and even if the patent were held to be valid, defendant could not be found liable as an infringer. As will hereinafter be shown, defendant had an implied license to make, use and sell the reinforcements defined by Patent No. 3 and plaintiff is estopped from asserting the patent against defendant.

## THE VALIDITY OF PATENT NO. 4

The invention described in Patent No. 4 is a division of the subject matter disclosed in parent application No. 698312 filed September 20, 1946. The patent is-sued on application No. 550580 filed December 2, 1955, the date of issuance being September 4, 1956. The subject matter of the patent is "dead end for cables."

A dead end of the type described in the patent may be defined briefly as the addition or attachment to a wire or cable of a device or structure which provides a link between the wire or cable and the point of attachment in which the link carries the full load being terminated. Such dead ends are to be distinguished from those in which the wire or cable is bent back upon itself to form a loop and the bent end is secured to the main body of the wire or cable by means of clamping, eye splicing, etc. In the latter type of dead end the bent or looped portion of the cable or wire provides the means of carrying the load being terminated.

The patent contains twenty claims. Article claims 1, 3, 5 and 8 through 14 and method claims 6 and 15 are alleged to be infringed.

Defendant contends that the claims alleged to be infringed are invalid, as being anticipated by the prior art and for lack of invention. The references cited by the Patent Office are Moxham Patent No. 337513 (1886), Peterson No. 2275019 (Patent No. 1).

Defendant advances the contention that certain drawings and specifications were added to the application in 1956; that because of the intervening five years of public use, the added materials should be disregarded. Implicit in defendant's argument is the claim that inasmuch as these added drawings and specifications did not appear in the parent application, No. 698312, plaintiff is not entitled to the earlier application date. Defendant has not shown that the above amendments constitute new matter. The presumption is the other way. In General Electric Co. v. Cooper Hewitt Electric Co., 249 F. 61 (6th Cir.), the court said:

"The rule is that insertions by way of amendment in the description or drawing, or both, do not hurt the patent, if the insertions are only in

776

amplification and explanation of what was already reasonably indicated to be within the invention for which protection was sought * * *."

The amendments here in question meet the requirements of the above rule. See also: Helms Products v. Lake Shore Mfg. Co., 222 F.2d 677 (7 Cir.); Wagenhorst v. Hydraulic Steel Co., 27 F.2d 27 (6th Cir.)

Defendant asserts that the half lays of preformed helical elements referred to in the claims and demonstrated in the drawings are to be found in Peterson's No. 1 patent. In support of its claim in this regard, defendant relies upon the testimony of the patentee and statements made by the latter's attorney to the Patent Office in the prosecution of the application for Patent No. 4. There is no express reference in the description of Patent No. 1 to half lays. However, the patent does show a plastic helical preformed half lay in one of the drawings. In his testimony relating to Patent No. 1, Peterson admitted that the drawing of the plastic half lay in Fig. 2 of Patent No. 1 was the equivalent of the "hand drawn wire preformed helical elements subassembled into a half lay."

During the prosecution of Patent No. 4, the Examiner rejected claims 8 through 12 as not being supported by the disclosure on the ground that "the 180 degree phase relationship of a helically preformed element is not disclosed as indicated above."

In reply, the applicant's attorney said, inter alia:

"In applicant's original patent No. 2,275,019, helical strips are provided which are in 180° phase relationship as preformed, and which are the equivalent of the half-lays 5, 5a and 5b of the present case." (Pl. Ex. 5, p. 26.)

Plaintiff argues that Peterson's quoted testimony must be considered as referable only to the subject matter of Patent No. 1 and that the statements to the Examiner relate solely to the equivalency of the 180 degree relationship of the legs of the dead end. Such arguments fail to give effect to the inventor's unqualified admissions of the equivalency of the plastic strip and the half lay of Patent No. 4. Notwithstanding such admissions, it is clear that there is nothing in the disclosures of Patent No. 1 suggesting the use of half lays of helical elements as components of a dead end. The dead end of Patent No. 4 is a new and useful device serving a function capable of producing novel and beneficial results beyond anything suggested or contemplated by the disclosures of Patent No. 1. The terms "half lay" and "whole lay" appear in patent literature for the first time in the parent application for Patent No. 4. Even if it be assumed that "half lays" were old in the art at the time such application was filed, it is nonetheless clear that the dead end of Patent No. 4 constitutes a distinct advance in the art and represents invention over the disclosures of Patent No. 1. Such apparently was the opinion of the Patent Office which considered Patent No. 1. Nothing has been shown that successfully impeaches that opinion.

Defendant relies heavily upon Selquist No. 2202538 as a pertinent prior art reference not cited by the Patent Office. Plaintiff contends that, although not cited by the Examiner, Selquist was considered by the Patent Office during the prosecution of the application for Patent No. 4. In support of such contention, plaintiff points out that Selquist was cited and an interference litigated with the application for Patent No. 1; that Selquist was cited as a reference in Patents No. 2 and 3; in the specifications of Patent No. 2 reference is made to Patent No. 1; and in the parent application No. 698312 reference is made to Patent No. 2. These facts, however, do not demonstrate that Selquist was considered as a reference against Patent No. 4. Nor does the fact that in 1951 the patentability of three dead end claims of Patent No. 2 was approved by the Examiner of parent application No. 698312 as well as the Examiner of the application for Patent No. 2, establish that Selquist was considered

as a reference in approving the claims of Patent No. 4. The evidence discloses that in July 1951, during the prosecution of Patent No. 2, the applicant's attorney clearly distinguished the dead end claims of that patent and the disclosures of the application for Patent No. 4. As a result of counsel's argument in this regard, the Patent Office retained the three claims in question in Patent No. 2 instead of transferring them to the application for Patent No. 4. It does not follow that because Selquist was considered by the Examiner of application No. 698312 in examining three claims of Patent No. 2 in 1951, that he or another examiner in the same division considered Selquist in passing upon the claims of Patent No. 4 either before or after the divided application was filed in December 1955.

Plaintiff contends further that it is as reasonable to conclude that Selquist's patent was considered and cast aside as not pertinent as to conclude that it was inadvertently overlooked. Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 4 (7 Cir.).

The reasoning of Artmoore and the cases cited therein is applicable in cases where it appears that the prior art not cited by the Patent Office was not pertinent. However, such is not the situation here. Indeed Selquist would seem to be a more pertinent reference than Patent No. 1. In many respects the three claims of Selquist are similar to claims 6, 7 and 8 of Patent No. 1. Each of the above claims of both patents provides for a portion of relatively straight wire integrated with the helical elements of the reinforcement. Neither the above claims of Patent No. 1 nor the claims of Selquist make any reference to a dead end. Fig. 10 of Selquist, however, illustrates a dead end in which the bight is formed by bending a portion of straight wire integral with the preformed helical elements of the reinforcement of the cable which is somewhat similar to the dead end of Patent No. 4. It seems highly improbable, therefore, that Selquist would have been cast aside by the Patent Office as not being a pertinent prior reference.

Defendant contends that the presumption of validity of a patent "cannot exist over pertinent prior art not considered by the Patent Office" and cites and relies upon the following cases of the Sixth Circuit Court of Appeals: Deering Milliken Research Corp. v. Electrical Furnace Corp., 261 F.2d 619; O'Leary v. Liggett Drug Co., 150 F.2d 656; Royal Patent Corp. v. Monarch Tool & Mfg. Co., 203 F.2d 299.

In each of the cited cases it was held that the prior art not cited by the Patent Office constituted anticipations of the patents in suit. As anticipations, such prior art was sufficient to overthrow the presumption of validity of the patents in controversy. However, where the patent in suit is not anticipated by pertinent prior art not cited by the Patent Office and lack of invention is not shown, the presumption of validity remains unimpaired.

The expressions of the court in the cited cases upon which defendant relies must be read in the light of the court's determination in each case that the pertinent prior art references not cited by the Patent Office anticipated the patent in suit. When so read, it becomes clear that in the cited cases the court did not hold nor do the opinions of the court imply that the mere failure of the Patent Office to consider pertinent prior art vitiates the presumption of validity of the patents in suit.

The statutory presumption of validity rests on the premise that the Patent Office has fully performed its public duty of ascertaining whether the device or process for which a patent is sought constitutes invention. This entails, among other things, a determination whether the disclosures in the application are patentably distinguishable from all pertinent prior art patents. The presumption of validity is, of course, rebuttable and may be overcome by evidence showing inter alia that the Patent Office was in error in distinguishing the patent in suit from pertinent prior art considered by it or that pertinent prior

art not considered by the Patent Office embodies patentable features of the issued patent and anticipates the latter or discloses lack of invention. But in the absence of proof showing an error in judgment of the Patent Office in either of the above respects no pertinent prior art reference is effective to overthrow the presumption of validity.

■■■ Where, as here, a defendant relies on a pertinent prior art patent not considered by the Patent Office, he assumes the burden of showing that the reference upon which he relies anticipates the patent in suit. In my opinion defendant has not sustained that burden.

The element of half-lays appears in Claims 1, 3, 5 and 6 of Patent No. 4. A half-lay may be roughly defined as a plurality of helical elements applied against each other and inter-twisted together. A half-lay is one-half of a tubular body of inter-twisted elements which constitutes a whole lay. Method Claim No. 6 of Patent No. 4 succinctly describes a dead end in which the bight consists of half-lays and the reinforcement of the cable is a whole-lay. Claim No. 6 reads:

> "The method of forming an elongated body having a bight integrally fashioned thereon, which comprises forming a half-lay of helically preformed elements, bending the half-lay back upon itself to define a bight and two half-lay legs, and intertwisting said legs to provide a whole-lay body upon said bight."

Claim No. 8 of the patent defines a dead end comprising an elongated body to be dead ended and a single helical element of constant open pitch throughout its length being bent adjacent its middle to form a bight with legs projecting therefrom, the legs being wrapped around said body so that the helix of one leg is in substantially 180 degree phase relationship with the helix of the other throughout their co-extensiveness along the elongated body. Claims 9, 10 and 11 are dependent upon Claim No. 8 and are substantially similar to the latter except that they provide for two or more helical elements. Claim No. 14 recites a plurality of helical elements "intertwisted into association coaxially with each other and, as associated, defining a relatively straight linear body gripping portion and a curved bight portion at one end of said gripping portion."

The foregoing is sufficient to indicate the scope and nature of the teachings of Patent No. 4.

The defendant relies solely upon the dead end illustrated by Fig. 10 of Selquist in support of its claim that the patent in suit is anticipated by Selquist. Fig. 10 of Selquist is similar to the dead ends of Patent No. 4 in the respect only that the reinforcement of Selquist which grips the cable is a helical element. The bight portion, however, consists of straight wire. Fig. 10 of Selquist is a dead end made of a reinforcement as shown in Fig. 4 of that patent which discloses a helical element at either end of the reinforcement with straight wire intermediate the respective helices. As indicated above, the straight wire is bent to form the bight. Thus the dead end of Fig. 10 of Selquist does not show a helical element of constant open pitch throughout its length bent adjacent its middle. There is no helical formation in the bight of the Selquist dead end. The plurality of helical elements in the bight of Patent No. 4 provide resiliency under load stress similar to that of steel springs. Such resilience is absent in the straight wire bight of Selquist. The use of a plurality of helical elements of the dead end in the patent in suit permits higher load-carrying capacities. These advantages are not found in the Selquist dead end. The dead ends of Patent No. 4 develop the full tensile strength of the cables to which they are attached, thus eliminating the need for using clamps. In the Selquist dead end, however, the full tensile strength of the cable is not developed and, as plaintiff argues reasonably, this may account for the suggestion in Selquist that clamps may be used. Mr. Sessions, the expert who testified on behalf of defendant, stated that under certain conditions it was difficult to maintain

the elements in 180 degree relationship as shown in Fig. 10 of Selquist. In contrast, it appears that in Claims 8 through 12 and 13 of Patent No. 4 the legs of the helical elements are in 180 degree relationship or balanced in peripheral distribution. Such relationship aids in sustaining and supporting the cable and preventing its deflection. The annealed metal bight of Selquist, which is somewhat flabby, would not hold the legs of the helical element in the relationship taught by Patent No. 4. As indicated, the metal bight of Selquist comprises but a single straight wire bent in the middle. The Selquist patent contains no suggestion of multiple wires, but even if it did, a plurality of loops formed of straight wire would not provide the same cushioning effect or the resiliency found in the bight of the dead ends of the No. 4 patent. If multiple straight wires were formed into a bight, there would be an uneven distribution of stress, causing individual wires, bearing loads beyond their capacity, to break separately and, as one witness said, they would "go down like a string of dominoes." In the bight of the helical elements of Patent No. 4 the load is evenly distributed among all elements. Thus, in the dead ends of Patent No. 4 the load-bearing capacity is much greater than in Fig. 10 of Selquist, and this would be true even if the single element of the latter were multiplied.

Defendant argues that Claims 10 and 13 of the Selquist application, which were cancelled, provided for or suggested the use of helical elements in the bight and that such cancelled claims are anticipations of Patent No. 4. This argument is without merit. Cancelled matter in an application does not appear in the patent nor is it otherwise published. As plaintiff says:

"Such cancelled matter secreted in the files of the Patent Office is no more communicated to any one than if it were merely written out by the inventor and retained in his portfolio."

In Fessenden v. Wilson, 48 F.2d 422, 18 CCPA 1171, the Court of Customs and Patent Appeals said:

"For obvious reasons, the filing of an application, the description of which is cancelled before it results in a patent or comes to the public notice, is not such a published description of the invention as is within the inhibition of the statute. Milburn Co. v. Davis-Bournonville, supra [270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651]."

The practice of the Patent Office is to regard cancelled matter in the application file of the patent as no bar to the allowance of a patent. In the Manual of Patent Examining Procedure, 2d Ed., Nov. 1953, U. S. Patent Office, Department of Commerce, the following rule is stated:

"Cancelled matter in the application file of a United States Patent is not a proper reference, since it is neither a patent nor a printed publication. See Fessenden v. Wilson, et al., 1931 C.D. 419; 410 O.G. 815."

The teaching of a prior art patent cannot, by reference, be enlarged to include disclosures which the inventor cancelled during the prosecution of his application in the Patent Office. Cancelled Claims 10–13 of Selquist therefore do not anticipate Patent No. 4.

It would serve no purpose to examine in detail the many other arguments advanced by defendant in an effort to demonstrate the invalidity of Patent No. 4. All such arguments have been considered but enough has been shown above to indicate the Court's view that Patent No. 4 discloses invention over the pertinent prior art. This is true with respect to the article claims in suit and also to method claims 6 and 15. The latter claims are distinguishable from the method taught by Selquist, which is to apply one end of the helical element to the reinforcement before the bight is formed. The method claims of Patent No. 4 teach the bending of the "half-lay" or "mutually conforming elements" before application to the conductor.

■ The invention of Patent No. 4 with its plurality of mutually conforming helical elements—its half-lays and whole lays—the element of constant open pitch —the intertwisting of the helices and their coaxial relationship—the bending of multiple helical elements and the 180 degree relationship of the legs of one helix with the legs of the other—combine to produce a dead end that is a distinctly useful innovation. The invention has received defendant's tribute of imitation. To a large extent, it has replaced the older and less efficient dead ends long in use in the electrical industry. The invention has achieved remarkable commercial success which, if the question of validity be considered doubtful, is sufficient to "tip the scales" in favor of the validity of the patent. Goodyear Tire & Rubber Co. v. Ray-O-Vac, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721.

I hold Patent No. 4 to be valid.

## INFRINGEMENT OF PATENT NO. 4

No debatable question arises in connection with the issue of infringement of Patent No. 4. The defendant manufactures and sells dead ends identical with the dead ends of Patent No. 4. It is beyond dispute that defendant sold its dead ends knowing the same were specially made and adapted for use in the infringement of Patent No. 4. The evidence discloses a clear case of contributory and direct infringement of the article and method claims in suit.

## LICENSE AGREEMENT

■ The License Agreement does not expressly include the subject matter of Patent No. 3. The only issue that merits discussion on this branch of the case is whether plaintiff is estopped to assert Patent No. 3 against the defendant by reason of an implied license to the latter under said patent. In September 1947, effective January 1, 1947, Peterson granted a license to defendant under Patent No. 1 and application No. 601245 (Patent No. 2) to make, use and sell "cable reinforcements which constitute the subject matter of said letters patent and applica-

tion aforesaid." The royalty rate provided in the license is 10% of defendant's net receipts until said royalties amount to $10,000, after which the royalty rate is 5%.

Application No. 601245 was considered as an improvement of Patent No. 1 and described by the inventor as establishing an "ideal" relationship between the reinforcement and the cable of association. Yet within 7 months after the execution of the license agreement, Peterson filed an application for Patent No. 3, asserting in the preamble thereof that the aim of such application was to cure the defects which were found to exist under conditions of actual use in the invention described in the application for Patent No. 2. As indicated above, Patent No. 2 issued containing claims that provide for "near conformance" of the pitch lengths of the helical element and the conductor and which, in my opinion, are indistinguishable patentably from the "slightly less" pitch lengths of Patent No. 3. It is also my opinion that if any difference exists between the respective pitch lengths of Patents Nos. 2 and 3, such difference is merely one of degree and the result of mechanical skill. However, for the purpose of the discussion that follows, and for such purpose only, it will be assumed that Patent No. 3 is valid.

After Patent No. 3 issued in September 1952, defendant resumed the manufacture and sale of helical reinforcements. All such reinforcements were of the same hand of lay as that of the conductors on which they were to be applied and the pitch lengths of the reinforcements were shorter than those of the strands of the cables. Defendant paid royalties to plaintiff on such reinforcements. Plaintiff accepted all such royalties over a period of 5 years to the time of the trial of this action in the amount of about $125,000. Plaintiff says that it continued to accept royalties during the pendency of this action because defendant's reinforcements were used in combination with a conductor in the manner claimed in the licensed patents, particularly Patent No. 1. Plaintiff explains its failure

to notify defendant that the royalties were applicable only to Patents Nos. 1 and 2 on the ground that plaintiff was not informed that defendant's products were made with the so-called short pitch. However, the true explanation of plaintiff's conduct is found in considerations other than those urged by plaintiff. Patent No. 1 does not provide that the hand of lay of the helical elements shall be the same as that of the strands of the conductor nor does Patent No. 1 define the length of the pitch of the element in relation to the length of the pitch of the strands of the conductor as is the case in both Patents Nos. 2 and 3. Plaintiff knew that as far back as 1946–1947 defendant was manufacturing helical reinforcements for The American Steel & Wire Company of the same hand of lay as the conductor and making the pitch lengths of such elements shorter than those of the strands of the cable. Prior to August 1947, plaintiff had manufactured and sold a large order of short pitch reinforcements which were used successfully on the Bonneville Dam Project, a fact that was made known to the industry by an article in the Electric Light and Power magazine in March, 1948.[2]

The industry was informed by Patent No. 3 that the invention of Patent No. 2 performed defectively in actual use. Plaintiff was fully aware that Patent No. 2 was a commercial failure and had been superseded by Patent No. 3. Testifying as a witness in this action, Peterson said:—"However, the No. 3 Patent followed close on the heels of this early establishment of the use of No. 2, and No. 2 just about evaporated." For years, all of plaintiff's own reinforcements, except dead ends, had been made under Patent No. 3, which plaintiff has maintained, albeit erroneously, covers all reinforcements with pitch lengths less than those of the strands of the cable. Under the state of the art after 1952 the manufacture and sale of the inventions of Patent No. 1 and Patent No. 2

was commercially unprofitable. Plaintiff was therefore bound to know that the large volume of reinforcements on which it was receiving royalties from defendant were made with a hand of lay the same as that of the cable and with pitch lengths less than those of the cables of association. In view of plaintiff's acceptance of royalties under the above circumstances, defendant was justified fully in concluding that plaintiff consented to the manufacture and sale by defendant of reinforcements within the scope of Patent No. 3. If defendant was mistaken in its belief that plaintiff consented to its use of Patent No. 3, then defendant was misled, to its prejudice, by plaintiff's conduct, and a clear case of estoppel against the latter is made out.

In Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 6 Cir., 101 F. 831, at 836, the court said:

"It is evident that the extent of an implied license must depend upon the peculiar facts of each case. The question in each case is whether or not the circumstances are such as to estop the vendor from asserting infringement."

In Walker on Patents, Deller Ed., Vol. 2, pp. 1468–1469, the author, after discussing cases involving implied licenses arising upon payment of partial compensation, made the following statement: "Payment of full compensation would be a still more convincing ground upon which to base an implied license."

Plaintiff has received full compensation on defendant's products, including those which do not have pitch lengths "slightly less" than the pitch lengths of the cables. Defendant has paid full compensation and more for the rights for which it bargained. It would be unjust and inequitable, therefore, to deny defendant the full benefits of those rights.

Defendant is entitled to an implied license upon another ground. It is reasonable to suppose that if at the time the

2. "Editor's Note—This is the complete text of a paper presented before the August, 1947, Pacific General Meeting of the American Institute of Electrical Engineers."

license agreement was executed the parties had considered the possibility that the invention of Patent No. 2 would be defective and necessitate a slight change in pitch length to make it a suitable and effective reinforcement, they would have fairly and honorably agreed that in such event defendant would be entitled to the use and benefit of such change whether the change was patentable as a separate invention or not. In Cold Metal Process Co. v. Republic Steel Co., D.C., 123 F. Supp. 525, 549, the parties had not considered the possibility that a certain patent application if granted might render the rights of the grantee ineffectual. In that situation the court indicated that if the parties had considered such a possibility—

" * * * it is to be assumed that express allowance would have been made in the agreement for such a circumstance. But even though not expressly provided for in the agreement, where it is contemplated that the licensee shall be able to make, use and sell a given device in a specified manner, the licensor is estopped from asserting against the licensee any other patent which it may then own or later acquire, the effect of which would be to deprive the licensee of the rights bargained for."

■ It is true that in the Cold Metal case and in the cases of Frederick B. Stevens, Inc. v. Steel & Tubes, Inc., 114 F.2d 815, 819 (6 Cir.), and National Rubber Machinery Co. v. McNeil Machine & Engineering Co., 132 F.2d 436 (6 Cir.), the subject matter of the agreements were specific devices. But underlying the rule applied in those cases is the fundamental principle that one who has received full compensation for a grant of patent rights cannot render those rights ineffectual by asserting another patent against his grantee. See United Printing Machinery Co. v. Cross Paper Feeder Co., D.C.Mass., 220 F. 322. In Victory Bottle Capping Machine Co. v. O. & J. Mach.

Co., 280 F. 753, 758 (1 Cir.), the court said:

"It is a maxim of the common law that one, granting a thing, impliedly grants that without which the thing expressly granted would be useless to the grantee. This maxim is as applicable to grants of patent rights as to other species of property. Steam Stone Cutter Co. v. Shortsleeves, 16 Blatch. 381, Fed. Cas.No.13,334; Brush Electric Co. v. California Electric Light Co., 52 Fed. 945, 960, 3 C.C.A. 368."

The foregoing principle has application here.

For the reasons stated, I hold that if Patent No. 3 be held valid, defendant has an implied license thereunder.

■ It is clear that the subject matter of the license agreement does not include the invention of Patent No. 4. It is clear also that defendant has no implied license to make, use and sell the dead ends of Patent No. 4. There is no similarity between such dead ends and the dead ends of Patent No. 2. Plaintiff refused all royalties tendered on dead ends manufactured and sold by defendant. None of the considerations relevant to the issue of implied license under Patent No. 3 are applicable to Patent No. 4.

The evidence discloses that in 1950–1952, before Patent No. 4 issued, the plaintiff paid Peterson royalties on dead ends and other subsetted items. Such payments were made pursuant to an oral agreement which was in effect during the above period. While Peterson had granted a written license to plaintiff upon the same terms as the 1947 license to defendant, the oral agreement was not a modification of the written license and consequently has no application to the most favored customer clause of that agreement.

I hold that defendant has no implied license to make, use and sell the dead ends of Patent No. 4.

## UNFAIR COMPETITION

In support of its claim of unfair competition, plaintiff relies upon evidence tending to show defendant competed unfairly in the several categories of business activity classified by plaintiff as follows: (a) magazine advertising; (b) catalogs; (c) catalog numbers; (d) filling orders from plaintiff's catalogs; (e) color coding; (f) exploiting plaintiff's trade-mark and trade name; (g) defendant's relationship (alleged conspiracy) with Line Material Company; (h) specific instances of palming off and confusion.

In addition to defending on the merits, defendant challenges the jurisdiction of this Court of the claim of unfair competition on the ground that no diversity of citizenship exists. The jurisdictional question was raised by defendant for the first time in its brief filed after trial. Defendant asserts that under Section 1338(b), T. 28, this Court has no jurisdiction of the claim of unfair competition. Plaintiff's position is that Section 1338(b) as applied to the facts vests jurisdiction in this Court of such claim and that the Court has jurisdiction of such claim under Section 1125(a), T. 15 (the Lanham Act) as well. The latter contention will be considered first.

In urging that Section 1125(a), T. 15, affords a remedy for its claim of unfair competition, plaintiff relies upon the concurring opinion of Judge Clark in Maternally Yours v. Your Maternity Shop, 234 F.2d 538 (2nd Cir.) and L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F. 2d 649 (3rd Cir.) In L'Aiglon the complaint alleged that plaintiff created and alone sold to the retail trade throughout the country a distinctively styled dress and advertised the same extensively. In its advertising plaintiff published pictures of the dress and its price—$17.95. It was further alleged that defendant offered for sale in interstate commerce a dress "much inferior in quality and notably different in appearance from plaintiff's;" that defendant published in a magazine of national circulation a display advertisement designed to promote the sale of its dress,—$6.95, "but showing as the most prominent feature of the advertisement an actual photographic reproduction of plaintiff's dress, thus fraudulently represented as the article defendant was selling for $6.95." Plaintiff claimed that such misrepresentation caused diversion of trade to defendant. The District Court held that no cause of action was stated under § 1125(a). Reversing that decision, Judge Hastie, speaking for the Court of Appeals, held that the above claim constituted a cause of action for unfair competition under § 1125(a) of which the District Court had jurisdiction. See § 1121, T. 15. Judge Hastie found no ambiguity in the statute and held that Congress had defined a statutory civil wrong of false description of goods in commerce. Such determination was sufficient for the purpose of deciding the L'Aiglon case. However, the statute also defines the civil wrong of a false designation of origin by the means described therein. Section 1125(a) in relevant part appears in the margin.[3] The question here presented is whether the evidentiary facts relevant to the issue of unfair competition in the case at bar bring such claim within the ambit of § 1125(a). A determination of that question requires an examination of the various grounds of unfair competition asserted by plaintiff. Such examination discloses the following:

(a) The defendant's magazine advertising was similar in some respects to that of plaintiff, and until 1955 it was

3. U.S.C.A., Title 15, § 1125.

"(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce * * * shall be liable to a civil action * * * by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

characterized by the dominant use of the same shade of red. In that year, however, plaintiff changed the color in its advertising to a "blue motif" and is hardly in a position to complain of defendant's continued use of red as the dominant color in its advertisements. It is not shown that defendant's advertisements contained any false designation of origin or any false description. Plaintiff and defendant were selling helical devices that were substantially identical and the descriptions thereof which were necessarily similar to those of plaintiff's devices were true and correct. The evidence discloses no instance of customer confusion resulting from defendant's advertisements nor does the likelihood of such confusion appear. The evidence shows only that one of plaintiff's representatives thought "there was a chance" of confusion and it was upon his assumption that plaintiff changed the dominant color of its advertisements to blue.

### Grounds (b), (c), (d), (g) and (h)

The catalog numbers used by defendant to describe the various armor rods and reinforcements are the same as those of plaintiff. The bird and animal names which appear with the numbers were not originated by plaintiff, but had been in general use in the industry for many years. Defendant's use of such numbers does not constitute false designation of origin nor was such use a false or misleading description of the articles defendant offered for sale. Defendant's catalog numbers as such caused no confusion. The evidence tends to show that the diversion of trade to defendant was caused by Line Material Company in filling orders of its customers who had specified armor rods as described in plaintiff's catalogs, with armor rods which Line Material Company procured from defendant. Although there was no similarity in the catalog numbers of plaintiff and defendant in relation to dead ends, orders for such devices were diverted to defendant presumably under the same circumstances as those relating to armor rods. ceived by Fanner from the Georgia Light & Power Company resulted from any

It does not appear that the orders refalse designation of origin or any false description. The evidence is clear that a short time before these orders were filled, the Purchasing Agent of Georgia Light & Power Company had been advised in writing by J. C. Little of Fanner that there was no connection between Fanner and Preformed Line Products Company. The evidence relative to the diversion of an order of The Eastern Oregon Electric Co-operative Company reveals no misrepresentation or false designation of origin by defendant.

Whether these instances of diversions of trade were the result of a conspiracy between Fanner and Line Material Company or other dealers is not within the scope of this discussion. The inquiry here is directed to the question whether Fanner committed any of the acts forbidden by Sec. 1125(a). I am unable to find a single instance of a violation of the statute in connection with the matters above discussed.

(e)—Color coding is used to identify products in the field to assure their use on the cables for which they were intended. It has no significance in relation to the source of the product. Furthermore, the color chart which defendant furnished its customers is described as "Handy color card for Fine Fanner Superformed Products." Manifestly this constitutes no false description.

(f)—Plaintiff has no registered trademarks. Its design mark is a circle surmounted by three wavy lines. In the circle appear the letters "P.L.P." Defendant's design mark is a circle surmounted by one wavy line. Above the line appears the words "Fine Fanner" and below it the word "Superformed." The lack of similarity between these marks is at once apparent. Plaintiff claims that the word "Preformed" has acquired a secondary meaning and that its use by defendant is an invasion of plaintiff's right to the exclusive use of that term. The word "preformed" is descriptive. It is defined as "formed beforehand." (Webster's New International Dictionary.) Plaintiff makes no claim

that it is the originator of the preformation of commercial or industrial products generally. Defendant used the word "preformed" in its invoices to The American Steel & Wire Company long before Preformed Line Products Company was incorporated. The defendant and the Indiana Steel & Wire Company as licensees under two of plaintiff's patents use the word in a descriptive sense, as they necessarily must, to fairly and adequately describe the licensed products. The term is regarded by the Sales Manager of plaintiff as descriptive. In a letter to one of plaintiff's agents, the Sales Manager said: "I suppose that the term preformed armor rods may be used to describe the type of armor rods, not the manufacturer, and since Fanner are licensed under some of our patents applying to preformed armor rods they may use this designation in that sense." As shown in the above quoted statement, plaintiff itself recognized that defendant could not describe the unique feature of its products otherwise than by the use of the term "preformed." In all of its sales literature, defendant uses the trade name "Superformed," prominently displayed in connection with the name "Fanner." The evidence does not disclose that the word "Preformed" acquired a secondary meaning, and there is no evidence tending to show that defendant used any false designation of origin or any false description or representation. All of the statements and representations in defendant's sales literature are literally true. It should be added that since August 1955 defendant's products when shipped in bundles or sets are clearly identified as to origin by tickets, tags or identifying tapes. Gummed labels were used for approximately 6 months prior to the above time and the back side of defendant's shipping boxes are stencilled to identify the goods therein as defendant's.

Upon a careful examination of the record I am unable to find any violation of Section 1125(a) in the case at bar.

The complaint in L'Aiglon v. Lana Lobell, supra, also alleged a cause of action under Section 44(a) (h) (i) of the Lanham Act (Sec. 1126, T. 15). The District Court held that Sec. 1126 was inapplicable. Affirming the District Court on this issue, the Court of Appeals noted the division between the Second Circuit, American Automobile Assn. v. Spiegel, 205 F.2d 771, and the Ninth Circuit, Stauffer v. Exley, 184 F.2d 962, Pagliero v. Wallace China Co., 198 F.2d 339, on the question whether Sec. 1126 created a federal law of unfair competition to the full extent of Congressional power to regulate commerce. As stated by Judge Hastie, the Ninth Circuit cases held that Section 1126 created a federal law of unfair competition with remedies available between United States citizens wherever there was present the requisite involvement of interstate commerce, whereas the Second Circuit in Spiegel, speaking through Learned Hand, declared that Sec. 1126: "* * * does not aim to create a federal law of unfair competition available to United States citizens one against the other nor does it grant the federal courts any new authority to hear such controversies between citizens."

After examining the reasons supporting these divergent views and the history of the Lanham Act, Judge Hastie adopted the view of the Second Circuit, and held:

"1. Congress, by its discussion and rejection of the broad provision of H. R. 4744 of the 76th Congress declaring all acts of unfair competition to be unlawful, revealed an unwillingness to give federal courts jurisdiction of unfair competition claims to the full extent of its power to regulate commerce."

Judge Hastie concluded his discussion with the following observations, which are peculiarly pertinent here:

"In addition, we think it is proper in construing the Lanham Act to give weight, as the court below did, to the fact that Section 1338(b) of Title 28 of the United States Code as adopted some two years after the Lanham Act gives the district courts

jurisdiction of 'any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trade-mark laws.' This seems to be a legislative codification of the rule of Hurn v. Oursler, supra. But there was no need for such a limited declaration of jurisdiction over unfair competition if the Lanham Act had covered this situation with countless others in a much broader grant of jurisdiction over all unfair competition in commerce. Thus Section 1338(b) strengthens the inference that *the Lanham Act was not intended to bring all unfair competition in commerce within federal jurisdiction."* (Emphasis supplied.)

The sound analysis and cogent reasoning in both the Spiegel and L'Aiglon cases compel the acceptance of the views therein expressed that the Lanham Act does not cover all claims of unfair competition. Under that Act, as construed by the Second and Third Circuits, three claims of unfair competition are made actionable: (1) those predicated upon false designation of origin by the means described in the statute; (2) false descriptions and misrepresentations in relation to goods sold in interstate commerce; and (3) practices of unfair competition covered by international conventions as to which citizens of the United States are granted rights reciprocal with those granted to aliens and others domiciled or doing business in foreign countries.

■■■ The evidence in the case at bar does not show an actionable claim of unfair competition under the Lanham Act.

## DOES THE COURT HAVE JURISDICTION OF THE UNFAIR COMPETITION CLAIM UNDER SEC. 1138 (b)?

Section 1338(b), enacted in 1948, provides:

"(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substan-

tial and related claim under the copyright, patent or trade-mark laws." (See Reviser's Note.)

Defendant concedes that a substantial claim under the patent laws has been presented. The precise issue to be determined therefore is whether such claim is related to the claim of unfair competition.

In cases where the question has arisen, the courts have looked to Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, for guidance in construing the statute. In Hurn, the Supreme Court defined the boundaries of federal jurisdiction of a non-federal claim when joined with a federal claim of substance. Speaking for the Court, Mr. Justice Sutherland, after reviewing a number of earlier Supreme Court decisions in which the governing rule was declared broadly, said:

"But the rule does not go so far as to permit a federal court to assume jurisdiction of a separate and distinct non-federal cause of action because it is joined in the same complaint with a federal cause of action. The distinction to be observed is between a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the non-federal *ground;* in the latter it may not do so upon the non-federal *cause of action.*"

In Hurn the bill alleged infringement of a copyright play. Joined with such claim and based upon the same facts was a claim of unfair competition. The trial court found adversely to the petitioner on the issue of infringement and dismissed the claim of unfair competition for want of jurisdiction. The Supreme Court held

that the dismissal of such claim for want of jurisdiction was error; that the unfair competition claim rested upon the same facts as that of infringement and ought to have been dismissed on the merits. During the pendency of the action the bill was amended to include a claim of unfair competition in relation to a non-copyrighted version of the play. The Supreme Court held that the District Court's dismissal of such claim on the jurisdictional ground was correct— "since that claim did not rest upon any federal ground and was wholly independent of the claim of copyright infringement."

In Armstrong Paint & Varnish Works v. NuEnamel Corp., 305 U.S. 315, 59 S. Ct. 191, 83 L.Ed. 195, the court restated the Hurn doctrine, holding that a federal court acquiring jurisdiction of an action for infringement of a registered trade-mark retains jurisdiction to determine on "substantially the same facts" the issue of unfair competition even though the plaintiff fails on the issue of infringement.

Most of the cases in which the question has arisen hold that Section 1338(b) is a codification of Hurn v. Oursler, and apply the "single cause of action" test there announced as well as the test of "substantially the same facts" to determine whether federal jurisdiction of a non-federal claim of unfair competition exists. As noted by District Judge Steel in American Securit Co. v. Shatterproof Glass Corp., D.C., 166 F.Supp. 813, 824, Note 5:

"The Second Circuit has wrestled long and agonizingly with the jurisdictional relationship problem when unfair competition claims have been joined with patent, trade-mark and copyright claims in non-diversity cases." (Citing numerous cases.)

The Court of Appeals of the Second Circuit has for the most part interpreted the Hurn doctrine strictly. However, in the recent case of Maternally Yours, Inc. v. Your Maternity Shop, Inc., supra, the Second Circuit broadened somewhat its construction of the doctrine. In that case the claim was infringement of a registered trade-mark to which was joined a claim of unfair competition which originated prior to the time of registration and which was based upon infringement of plaintiff's mark during the pre-registration period. In rejecting the defendant's contention that the accrual of the unfair competition claim prior to the registration of the mark was fatal to the court's jurisdiction of such claim, the court said that the purpose of Section 1338(b) to avoid piecemeal litigation "would be frustrated were we to accept defendant's contention that the two claims must have exact chronological correspondence and identity." That the Court considered its enlarged jurisdiction to be within the rule laid down in Hurn is evidenced by its statement that: "the doctrine of Hurn v. Oursler * * * was included in the 1948 Judicial Code as 28 U.S.C.A. § 1338(b)." The Court was also careful to note: "The close relation of the two claims is demonstrated by the considerable overlap in their factual basis and by the additional fact that nearly all of the evidence * * * other than that concerned with plaintiff's application and registration of [the trade-mark] was relevant to both claims." In effect, the Court held that the infringement of the trade-mark before its registration and infringement of the trade-mark thereafter constituted two distinct grounds of a single cause of action.

In French Renovating Co. v. Ray Renovating Co., 170 F.2d 945 (6th Cir.), the question raised was whether the District Court had jurisdiction of non-federal claims for breach of contract and breach of trust joined with claims for patent and copyright infringement. In deciding against jurisdiction, the court said:

"Before the District Court in such a case may accept jurisdiction of such non-federal causes of action, it must appear that both federal and non-federal causes rest upon substantially identical facts. Hurn v. Oursler, supra, 289 U.S. at page 246, 53 S.Ct. at pages 589, 590, 77 L.Ed. 1148."

Although Section 1338(b) was not applicable in the last cited case, in view of the inclusion in the statute of the doctrine of Hurn v. Oursler, the Sixth Circuit's strict construction of the Hurn case is not without significance.

Defendant relies upon Hook v. Hook & Ackerman, 233 F.2d 180 (3rd Cir.), which was a suit for declaratory judgment that plaintiff's boiler did not infringe defendant's patent. Defendant counterclaimed, alleging infringement and unfair competition. The unfair competition claim was based upon plaintiff's use of a confusingly similar casing for its boiler and a similar name. Affirming the District Court's dismissal of the unfair competition claim for want of jurisdiction, the Court of Appeals said:

"The source of the stated unfair competition was completely separable from the patent case and no so-called 'logical relationship' as the appellant now seems to rely on in its reply brief can be forced on them simply because the one boiler appears in both. The complaint sought decision of a single right, that is whether appellees' boiler infringed appellant's patent. The unfair competition claim rests not on that but on two elements which were not even present in the main litigation, namely, confusion of outward appearance and of name. The district court was justified in refusing to pass upon the merits of the counterclaim and in dismissing it for lack of jurisdiction."

Plaintiff relies on Bullock v. Sears Roebuck Co., 239 F.2d 170 (2 Cir.), which also involved claims of patent infringement and unfair competition and in which it was held that the District Court had jurisdiction of the claim of unfair competition. In my opinion, the reasoning of Bullock is less persuasive than that of Hook v. Hook & Ackerman, supra. In Bullock the Court of Appeals reversed the District Court in a single paragraph per curiam opinion, holding in the second sentence thereof that "the complaint alleges sufficient interrelation between the two claims to establish federal jurisdiction under 28 U.S.C.A. § 1338(b), as interpreted in Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2 Cir., 234 F.2d 538."

In its brief opinion the Second Circuit made no reference to the reasoning of the District Court or to the similar factual situation in Hook v. Hook & Ackerman, supra, but rested its reversal of the District Court solely upon the authority of Maternally Yours, Inc. v. Your Maternity Shop, Inc., which involved infringement of a trade-mark which itself is a form of unfair competition. It has been suggested that an interpretation of Sec. 1338(b) that enlarges jurisdiction beyond that allowed under the liberal view of Hurn as construed in Maternally Yours, Inc. v. Your Maternity Shop, Inc. may not be possible because of constitutional complications. 70 Harv.L.Rev. 1469 et seq. Plaintiff also relies upon American Securit Co. v. Shatterproof Glass Corp., D.C., 166 F.Supp. 813, supra. In that case Counts I to IV of the complaint alleged infringement of patents. The unfair competition counts V and VI charged that plaintiff was fraudulently induced "to forego asserting against defendants its rights as a patent owner because of defendant's fraud and deception." The Court held that an intimate and interlocking relationship between Counts I to IV and Counts V and VI is therefore manifest. The Court also held that both claims comprised but a single cause of action. Like the infringement counts, the unfair competition counts in the Securit case alleged a wrongful invasion of plaintiff's rights under the patent and, as the Court said:

"Since at bar the patent infringement is an integral part of the unfair competition counts, the proof required to substantiate all counts must in large measure overlap."

Thus in the cases relied on by plaintiff, the courts found the requisite statutory "relationship" in the single cause of action concept of Hurn v. Oursler, where there was a direct and logical relation between the claims of unfair competition

and patent infringement evidenced by a "considerable" overlapping of the proof on both claims. But no case has been cited or found that holds such relationship exists where the claim of unfair competition was wholly independent of a claim of infringement. The latter situation is exemplified here. The evidence supporting plaintiff's various grounds of unfair competition is in no way related to the claim of patent infringement. The two claims do not rest upon "substantially the same facts" and there is little, if any, overlapping of proof relevant to both claims. The asserted wrong in the patent infringement claim is defendant's invasion of plaintiff's lawful monopoly and its right to exclude others from making, using or selling the patented devices. The essence of the wrong in the unfair competition claim is confusion of goods and the sale of defendant's goods for those of the plaintiff. See Howe Scale Co. v. Wyckoff, et al., 198 U.S. 118, 140, 25 S.Ct. 609, 49 L.Ed. 972. These are separate and distinct federal and non-federal causes of action, each requiring different evidentiary facts to sustain the charge. All the grounds upon which plaintiff's claim of unfair competition is based are separate and distinct from the claims of patent infringement.

■ Accordingly, I hold that this Court does not have jurisdiction under Section 1338(b) of the non-federal cause of action of unfair competition.

## MISUSE

Defendant contends that plaintiff has misused the patents in the suit by illegally extending the scope of its patent monopoly and violating Section 3 of the Clayton Act, Sec. 14, Title 15 U.S.C.A., which in pertinent part provides:

"It shall be unlawful for any person engaged in commerce, * * * to * * * make a sale or contract for sale of goods, * * * whether patented or unpatented, for use, consumption, or resale within the United States * * *, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, * * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

■ In support of its contention, defendant relies in part upon the testimony of P. H. Schloss, Treasurer and Sales Manager of plaintiff, who stated on cross-examination that it was plaintiff's general policy not to sell to distributors or dealers unless they agreed to sell plaintiff's products exclusively. Defendant also relies upon evidence tending to show specific applications of such general policy and upon evidence of a written contract between plaintiff and the Condon Company of Los Angeles, California, one of plaintiff's exclusive sales representatives. The last mentioned ground merits but brief comment. By the terms of the contract Condon agreed not to "handle or sell, either directly or indirectly, any products similar to or competing with any products" of plaintiff and not to sell any of plaintiff's products to any manufacturer or supplier competing with plaintiff or to an agent of such manufacturer or supplier. The Condon Company is not a dealer or distributor. It does not buy and re-sell plaintiff's products. Its relationship to plaintiff is that of sales representative. The selection of an exclusive representative is not within the ban of the antitrust laws nor does it contravene the public policy of the patent laws. In Federal Trade Commission v. Curtis Publishing Co., 260 U.S. 568, 582, 43 S.Ct. 210, 213, 67 L.Ed. 408, the court said:

"Mere selection of competent, successful and exclusive representatives in the orderly course of development can give no just cause for complaint, and, when standing alone, certainly affords no ground for condemnation under the statute."

■ To the same effect is United States v. General Electric Co., D.C., 82

F.Supp. 753, 884. The written agreement with Condon is no evidence of patent misuse.

The following testimony was elicited during the cross-examination of Schloss:

"Q. All right. What has been the practice of Preformed Line Products Company where a distributor or a jobber may desire to handle Fanner products as a secondary line or a correlated line with Preformed Line Products' devices? What has been your policy—you are sales manager—in that regard?

"A. I would say that we don't want them selling both products.

"Q. That is, you do not want a distributor to sell Fanner products at all; he is either going to sell all Preformed Line products or he isn't going to sell any; hasn't that been your policy?

"A. I would say in general, yes."

Schloss testified further that he knew defendant was a licensee of plaintiff manufacturing and selling certain products and paying royalties but that these facts were not considered in adopting plaintiff's general policy in respect of exclusive dealing. He stated in effect that such policy was designed to eliminate confusion as to the source of the helically preformed products after they had been applied to cables by restricting purchases of such products to dealers who handled the products of a single manufacturer exclusively. Schloss was then interrogated at length in relation to a series of transactions affecting plaintiff's business relations with The General Electric Supply Company of Portland, Oregon. His testimony, together with letters received by him from plaintiff's sales representatives in the Northwest, disclosed the following facts: For several years prior to 1956 The General Electric Supply Company of Portland had been a valued distributor of plaintiff's products. In 1956 The General Electric Supply Company switched its business to defendant. Upon learning of the switch, plaintiff's sales representatives inaugurated an aggressive campaign of prevailing upon The General Electric Supply Company's customers to place their orders with other distributors who handled plaintiff's products. While this campaign was in progress, Schloss made a trip to Portland and interviewed officers of the distributing company in an effort to convince them of the advantages of resuming business relations with plaintiff. As a result of plaintiff's campaign the distributor suffered a severe loss of business and eventually agreed to deal exclusively with plaintiff. In a letter to Schloss dated December 10, 1957, a sales representative of plaintiff described his efforts in this campaign as "forcing" decision of General Electric Supply Company "to go Fanner or Preformed." On the following day Schloss received another letter from the same representative in which it was stated inter alia:

"Phil, with regard to General Electric Supply Company, Portland and Medford, I can give you every assurance that they are now totally 100% Preformed Line Products Company and have discontinued the promotion and sale of Fanner."

When asked whether plaintiff followed its general policy of exclusive dealing in relation to the General Electric Supply Company matter, Schloss said:

"It is possible that the representative told them it had to be one or the other. I did not tell them that it had to be one or the other actually because they were already aware of it when I spoke to them."

Thus it appears that while ostensibly General Electric Supply Company was given the option of dealing exclusively with Fanner or with plaintiff, the fact is that by reason of its severe loss of business due to plaintiff's campaign, the dealer had no alternative but to deal exclusively with plaintiff. It may be fairly assumed that the pendency of this action during the above period was known to General Electric Supply Company and undoubtedly influenced its decision.

Plaintiff had the right to refuse to sell any of its products to General Electric Supply Company. It also had the right to take legitimate and effective steps to prevent distributors from purchasing dead ends from defendant, who was infringing Patent No. 4 by the sale of such devices. However, plaintiff transgressed the bounds of legality by requiring General Electric Supply Company to buy all of its products from plaintiff as a condition of purchasing any products from plaintiff. Plaintiff's conduct in this regard substantially lessened competition, and tended to create a limited monopoly outside the scope of Patent No. 4.

While the case of The General Electric Supply Company is the only instance shown by the evidence in which defendant's interests were affected directly, there is evidence of other specific applications of plaintiff's general policy of exclusive dealing in relation to the distributors of Indiana Steel & Wire Company. Defendant offered in evidence a letter dated April 10, 1958, from F. L. Irvin, an employee of plaintiff in its Home Office in Cleveland, Ohio, to Shaffer & Nelson, plaintiff's sales representative at Spokane, Washington. Attached to the letter is a memorandum styled "Blind note to P. L. P. personnel" also signed by Irvin. The first two paragraphs of the "Blind note" read:

> "The Shaffer & Nelson organization, plus ourselves, have been trying to swing Graybar to the purchase of our materials only. Up to this date, they have wanted to purchase only products not manufactured by Indiana Steel & Wire Company from Preformed and to continue the purchase of their armor rods from the Indiana Steel & Wire Company.

> "Based on this thinking by Graybar, we have refused to ship them any of our products. This approach has worked successfully with a number of other Graybar houses in the country, where we have been able to convince them to purchase all of their products from our company.

"* * * * * Frank L. Irvin"

Indiana Steel & Wire Company is also a licensee of plaintiff under Patents Nos. 1 and 2. The catalog of that licensee containing prices and specifications revised to October 25, 1957 was received in evidence. That exhibit indicates that Indiana's sales of helical preformed products do not include dead ends but is limited to armor rods. The front and back covers of the exhibit disclose that the Graybar Electric Company was Indiana Steel & Wire Company's distributor. Specific instances of the plaintiff's application of its policy of exclusive dealing as applied to Graybar "houses" are referred to in the "Blind note" as is plaintiff's purpose to enforce that policy against the Graybar Company of Spokane, Washington. From the above exhibits it appears clearly that the sale of dead ends to Graybar was conditioned on the purchase by that company from plaintiff of other products not within the protection of Patent No. 4.

Plaintiff argues that even if it had an exclusive dealing policy with its distributors such policy was justified for the following reasons: (1) Plaintiff was merely trying to prevent the sale of infringing goods; (2) confusion in the trade when one distributor handled the lines of both plaintiff and defendant; (3) plaintiff simply refused to deal with distributors not promoting plaintiff's products with sufficient vigor. These arguments are not supported by the evidence,—(1) that plaintiff did more than endeavor to prevent infringement is evident from facts shown above. Its attempt to secure a limited monopoly on all helically preformed reinforcements is too clearly demonstrated to warrant further comment. The case of Baldwin-Lima-Hamilton v. Tatnall Measuring Systems Co., D.C., 169 F.Supp. 1, 31, lends no support to plaintiff's position. In that case the court dismissed the suit for infringement on the ground of misuse of the patent, saying:

> "* * * the manner in which Baldwin has 'tied' the use of the Simmons gage to the use of appa-

792

ratus not covered by the Simmons patent sold by it and by its licensees, constituted a misuse of the Simmons patent."

(2) It is apparent that confusion of goods was of little concern to plaintiff when it sought to obtain all of the business of distributors handling a full line of helically preformed devices. Moreover, if confusion of goods was a matter of serious concern, legal and effective means to eliminate such confusion were available to plaintiff. (3) This Court has already stated that plaintiff had a right to refuse to deal with distributors and plaintiff correctly asserts that a refusal to deal does not per se constitute a violation of the antitrust laws. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. However, as indicated above, much more was involved in the carrying out of plaintiff's policy than a mere refusal to deal. Plaintiff's real purpose was to foreclose competition by its licensees who were its only competitors. Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 247 F.2d 343, 359 (2 Cir.) is not in point. In that case it was found on conflicting evidence "that 3M does not have a sales policy requiring a jobber or distributor to sell only 3M tape and to refrain from selling other competitive brands." Here the evidence of plaintiff's general policy and its effectuation in the specific instances shown by the record is uncontradicted and clearly discloses misuse of the patent monopoly and violations of the Clayton Act. Plaintiff's reference to Mr. Justice Douglas' observation in Denver Union Stockyards Co. v. Producers Livestock Marketing Assn., 356 U.S. 282, 288, 78 S.Ct. 738, 2 L.Ed.2d 771 is irrelevant. The reference in the cited case is to "exclusive agencies." Here we are concerned with exclusive distributors and exclusive dealers. Plaintiff asserts that F. C. Russell v. Consumers Insulation Co., 226 F.2d 373 (3 Cir.), relied upon by defendant, is distinguishable in that the Russell case involved written agreements with 76 distributors and 30 to 100 dealers and that the agreements barred the distributors and dealers from selling competitive storm windows of any kind. These distinctions are without legal significance. The condition upon which plaintiff sold its goods to distributors was just as effective in restraining competition as the comprehensive terms of the written contracts in Russell. Nor is it material that plaintiff has no written contracts with distributors. In Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 463, 58 S.Ct. 288, 82 L.Ed. 371, the patentee advanced the argument that its use of the patent was not within the rule of Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, because in the latter case attempts to expand the lawful monopoly of the patent were made by contracts or notice. In rejecting the argument, Mr. Justice Brandeis said:

"It (the Carbice case) denied relief, not because there was a contract or notice held to be inoperative, but on the broad ground that the owner of the patent monopoly, ignoring the limitation 'inherent in the patent grant,' sought by its method of doing business to extend the monopoly to unpatented material used in practicing the invention. By the rule there declared every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited."

In the case at bar, plaintiff's methods of doing business were the means employed to secure a limited monopoly outside the scope of Patent No. 4.

Misuse of Patent No. 4 is shown clearly in plaintiff's transactions with Graybar Electric Company. The evidence relative to plaintiff's dealings with General Electric Supply Company in 1957 lead inescapably to the same conclusion. Patent No. 3 allegedly covering the so-called short pitch armor rods issued in 1952. Following the issuance of that patent plaintiff accepted royalties from Fanner and apparently from Indiana Steel & Wire Company on all armor rods manufactured and sold by its licensees. As shown above, such royalties

were accepted from Fanner during the pendency of this action. While plaintiff competed with its licensee in the sale of armor rods, the record discloses no attempt on its part to restrain competition until after the issuance of the dead end patent No. 4 in September 1956. After the commencement of this action in October 1956, the plaintiff embarked upon the policy of restraining competition in unpatented or licensed armor rods by tying the purchase of such devices to the purchase of the patented dead ends, thus attempting to create a limited monopoly in unpatented devices in contravention of the public policy of the Constitution and laws of the United States covering patents. Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. As stated by the court in the cited case:

"It is the adverse effect upon the public interest of a successful infringement suit, in conjunction with the patentee's course of conduct, which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent."

Plaintiff is the largest manufacturer and seller in the United States of helically preformed reinforcements and attachments for use on electric cables and is unquestionably the dominant company in this specialized field, its only competitors being its two licensees. The dead ends covered by Patent No. 4 have gained wide acceptance in the electrical industry. Due to the constantly growing demand for such devices, jobbers and distributors of armor rods are required as a matter of good business to carry preformed dead ends in stock. The infinite possibilities for public and private harm inherent in plaintiff's continued misuse of its patent monopoly can be abated only by a denial of relief to plaintiff in this action. Carbice Corp. of America v. American Patents Development Corp., supra; Leitch Mfg. Co. v. Barber Co., supra; Morton Salt Co. v. Suppiger Co., supra; Mercoid Corp. v. Mid-Continent Investment Corp., 320 U.S. 661, 64 S.Ct.

268, 88 L.Ed. 376. See also Barber-Coleman Co. v. National Tool Co., 136 F.2d 339 (6th Cir.), where it was held that an attempt to use a patent unreasonably to restrain commerce is not only beyond the scope of the grant but is also in direct violation of Section 3 of the Clayton Act. If, contrary to this Court's determination, it were held that Patent No. 3 is valid, plaintiff nevertheless would be guilty of patent misuse. As was stated in Ethyl Gasoline Corp. v. United States, 309 U.S. 436, at 459, 60 S.Ct. 618, at 626, 84 L.Ed. 852:

"The patent monopoly of one invention may no more be enlarged for the exploitation of a monopoly of another, see Standard Sanitary Mfg. Co. v. United States, supra [226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107], than for the exploitation of an unpatented article, * * *."

■■■ Of course the misuse of a patent does not invalidate the grant. The denial of relief in the present action will continue until plaintiff is able to show that it has wholly abandoned its improper practices and that the consequences of such practices have been fully dissipated. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367.

### IS DEFENDANT ENTITLED TO DAMAGES?

To establish plaintiff's violation of Section 3 of the Clayton Act defendant relies upon the same facts that constitute misuse of Patent No. 4. That defendant lost the business of General Electric Supply Company as a result of plaintiff's misuse of the patent is not open to question. But whether defendant has sustained its claim for damages is seriously to be doubted. As proof of damages, defendant relies solely upon evidence showing that in 1956 its sales to General Electric Supply Company amounted to $19,182 and that its sales to that distributor in 1957 were reduced to $1,048 and reduced further in 1958 to $138. It is not entirely clear that the loss of sales in 1957 was due entirely to plaintiff's improper con-

duct. It was not until December of that year that plaintiff received assurance from its representatives in the Northwest that The General Electric Supply Company had discontinued dealing with Fanner. Defendant submitted no proof of its manufacturing or selling costs or any evidence tending to show the profits, if any, realized on its sales to General Electric Supply Company in 1956 or tending to show its loss of anticipated profits in the two subsequent years. Even if it be assumed that the fact of damage has been established, the evidence does not warrant an award of damages under the liberal policy announced in Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, and Story Parchment Co. v. Patterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. In Bigelow the cost of film and petitioner's receipts before and after the alleged conspiracy were shown by the evidence. This proof was regarded by the Supreme Court as constituting a proper evidential basis upon which to estimate damages. But the court was careful to note that an award of damages may not be "based on speculation or guesswork."

However, it cannot be said fairly that defendant has established "the fact of damage." Plaintiff has not shown the proportions of its sales to General Electric Supply Coompany attributable to armor rods and to dead ends. That some portion of defendant's revenue on sales to General Electric Supply Company was derived from the sale of dead ends is a fair inference from the evidence. These sales constituted infringements of Patent No. 4. Furthermore, defendant infringed Patent No. 4 by sales of dead ends to other dealers and jobbers. As an incident of this Court's action in vindication of the public policy of the patent laws, defendant is permitted to retain the profits realized from its own tortious conduct. Plaintiff may not enforce Patent No. 4 until it purges itself of its improper practices. When that occurs plaintiff may enforce its patent "and recover damages for infringement occurring thereafter." Novadel-Agene Corp. v. Penn, et al., 119 F.2d 764 (5 Cir.), cert. den. 314 U.S. 645, 62 S.Ct. 85, 86 L.Ed. 517; Eastern Venetian Blind Co. v. Acme Steel Co., 188 F.2d 247, 254 (3 Cir.). It is not the policy of the law to permit an unreformed plaintiff in a patent case to recoup damages while engaged in misusing the patent. Nor is it consonant with justice to permit a defendant in such case to recover damages under the Clayton Act while he retains the profits of his own tortious conduct as an infringer, especially where no showing is made by the defendant that such profits are less than the damage, if any, caused by plaintiff's violation of the antitrust laws. See Gray Tool Co. v. Humble Oil & Ref. Co., 186 F.2d 365, 369, 370 (5 Cir.). Defendant has not made out a case for damages.

In accordance with the foregoing, plaintiff's claim of infringement of Patent No. 3 is dismissed on the ground that said patent is invalid and upon the further ground that if said patent be considered valid, plaintiff is estopped to enforce the patent against defendant.

Patent No. 4 is held valid and infringed but said claim of infringement is dismissed on the ground that plaintiff has misused Patent No. 4.

Plaintiff's claims of unfair competition are dismissed on the ground this Court lacks jurisdiction to hear and determine such claims. Said dismissal is without prejudice to the prosecution of said claims in a court of competent jurisdiction.

Defendant's counterclaim for damages is dismissed.

An order may be prepared in accordance with the foregoing,[4] and [5] the above

4. March 24, 1960. "The entry of judgment in this action will be delayed pending determination by this Court whether plaintiff has abandoned the practices constituting misuse of Patent No. 4, and whether the consequences of such misuse have been wholly dissipated."

5. July 14, 1961. " * * * It having appeared that certain references by plain-

memorandum constitutes Findings of Fact and Conclusions of Law in accordance with Rule 52(a).

SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ISSUES RAISED BY SUPPLEMENTAL PLEADINGS FILED PURSUANT TO ORDER OF MARCH 24, 1960, AND UPON THE INTERLOCUTORY ORDER OF JULY 14, 1961.

## FINDINGS WITH RESPECT TO THE ISSUE OF PURGE

1. On January 12 and 13, 1960, plaintiff prepared and distributed to its employees and sales representatives and to trade magazines a summary of the Court's Opinion of January 6, 1960, as evidenced by Pl. Ex. 201 through 205, inclusive.

2. The Opinion of the Court dated January 6, 1960 was given wide publicity throughout the trade interested in the purchase and use of helically shaped products through the efforts of both plaintiff and defendant.

3. On January 28, 1960, plaintiff notified all of its customers, distributors and jobbers that they were free to buy whatever they wished from plaintiff without restrictions of any kind, including tie-in arrangements or exclusive dealing practices, by sending letters to 6,601 customers and 1,827 distributors and jobbers of plaintiff, as evidence by Pl. Ex. 200 through 200D, inclusive.

4. On January 28, 1960, all of plaintiff's sales personnel and sales representatives were instructed by plaintiff to refrain from any direct or indirect attempt at a tie-in or exclusive dealing practice, as evidenced by Pl. Ex. 200, 200E and 200F.

5. During February and March 1960, a statement of plaintiff's sales policy was published at plaintiff's expense in the seven principal trade magazines covering those interested in the purchase and use of helically shaped products, as evidenced by Pl. Ex. 207 and 209 through 214, inclusive, said magazines having a total circulation of over 100,000 per month.

6. On February 5, 1960, at a special meeting, plaintiff's Board of Directors ratified and confirmed each of the foregoing actions and formally adopted a sales policy in conformance thereto, such policy stating in substance that any customer could buy any product manufactured or sold by plaintiff without reference to tie-in of any other product manufactured or sold by it and that plaintiff's distributors and jobbers were free to deal in the products of plaintiff's competitors, including the defendant, The Fanner Manufacturing Company, as evidenced by Pl. Ex. 215.

7. Since the Special Meeting of its Board of Directors on February 5, 1960, plaintiff has repeated and emphasized its sales policy at staff and departmental meetings, at semi-annual sales meetings addressed by counsel on the subject, and by conferences between plaintiff's Vice President-Sales and its sales representatives.

8. No instance of misuse of Patent No. 2,761,273 (hereinafter Patent No. 4) by plaintiff was testified to by any witness for either party from the date of the accession of Edmund H. Brown as General Manager of Sales of plaintiff on September 1, 1958 through June 15, 1961 when the hearing upon the purge issue was concluded, nor was any such misuse reported to either party, although each

tiff to Patent No. 2,609,653 (Patent No. 3) are misleading and contrary to the determination made by this Court on January 6, 1960, that said patent is invalid and that if valid, defendant has an implied license thereunder and plaintiff is estopped to assert said patent against defendant.

"It is ordered that plaintiff discontinue any such reference to Patent No.

2,609,653 (Patent No. 3) on its quotations and that plaintiff notify its sales personnel, including sales representatives, its distributors and jobbers and its customers of the determination of the Court regarding Patent No. 2,609,653 (Patent No. 3) and the fact that reference will no longer be made thereto in submitting quotations to customers."

796

requested information on the subject from sources apt to know.

9. Neither the testimony of employees of the defendant or General Electric Supply Company or Graybar Electric Company or Indiana Steel and Wire Company nor any other proof before the Court at the time of the hearing of the purge issue on June 12 through June 15, 1961 indicated any continuing harmful effects or consequences of the past misuse of Patent No. 4 found and determined in the findings of fact incorporated in the Opinion of the Court dated January 6, 1960.

10. Plaintiff has ceased any improper practice or misuse of Patent No. 4, and no consequences of its past misuse of said patent were continuing on June 15, 1961.

## FINDINGS WITH RESPECT TO THE ISSUE UNDER THE INTERLOCUTORY ORDER OF JULY 14, 1961.

11. On July 10, 1961, the day upon which the Court orally stated its criticism, later embodied in the Interlocutory Order of July 14, 1961, of plaintiff's continued reference to Patent No. 2,609,653 (hereinafter Patent No. 3) in quotations submitted to its customers and potential customers, plaintiff discontinued the use of any reference to said patent or license thereunder in its quotations, as evidenced by Pl. Ex. 267 through 267C, inclusive.

12. Reference to Patent No. 3 was deleted from all correspondence, advertisements and product literature prepared by plaintiff after July 10, 1961, as evidenced by Pl. Ex. 267 through 267B, inclusive.

13. Reference to Patent No. 3 was deleted from plaintiff's stocks of advertising literature on hand beginning July 14, 1961 and no such undeleted literature was sent out after said date, as evidenced by Pl. Ex. 267 and 267G through 267O, inclusive.

14. On July 22, 1961, plaintiff mailed a copy of the Interlocutory Order of July 14, 1961, together with an explanatory letter, to 13,906 customers and potential customers, 2,036 distributors and jobbers and 199 sales personnel and sales representatives, the recipients of said order and explanatory letter constituting all of plaintiff's customers, known potential customers, distributors, jobbers, sales personnel and sales representatives, as evidenced by Pl. Ex. 267 and 268 through 268G, inclusive.

15. On July 14, 1961, by oral instructions confirmed July 19, 1961 by written memorandum, plaintiff discontinued any reference to the license or absence of license under any patent on its quotations, regardless of the patent involved, as evidenced by Pl. Ex. 267, 267D and 267E.

16. On and after July 19, 1961, plaintiff deleted any reference to Patent No. 3 on all shipping containers used by plaintiff, as evidenced by Pl. Ex. 266 through 266F, inclusive, 267 and 267P.

17. On July 27, 1961, plaintiff adopted a standard operating procedure requiring the specification of the particular patent applicable to each type of product involved in all quotations made and advertising literature used, as evidenced by Pl. Ex. 267 and 267F.

18. The affidavits of Messrs. Albert C. Bonds, Edmund H. Brown and Orval E. Wells in proof of paragraphs 11 through 17 above which were served on defendant and filed on July 27, 1961, are uncontroverted.

19. Plaintiff's reference to Patent No. 3 in quotations during the period January 6, 1960 to July 10, 1961 was the continuation of a practice adopted by plaintiff before this Court rendered its decision on the validity and license of Patent No. 3, and was continued by plaintiff pursuant to the advice of its patent counsel.

20. Adequate notice was given to all interested persons regarding the holding of the Court on Patent No. 3 after the entry of the Interlocutory Order dated July 14, 1961, and plaintiff has thereafter made no misleading reference to Patent No. 3.

21. Plaintiff has complied fully with the Interlocutory Order of July 14, 1961.

## CONCLUSIONS OF LAW

1. Plaintiff has wholly abandoned its improper practices or misuse of Patent No. 4 since January 6, 1960, and the consequences of its past misuse were fully dissipated by June 15, 1961.

2. Plaintiff has not misled its customers and potential customers by references to Patent No. 3 since compliance with the Court's Interlocutory Order of July 14, 1961, and any consequences of prior misleading references were fully dissipated by August 1, 1961.

3. Plaintiff became purged of any misuse of Patent No. 4 and any misleading reference to Patent No. 3 on August 1, 1961.

4. Plaintiff is entitled to a permanent injunction restraining the defendant from infringement of Patent No. 4 and to an accounting by the defendant of its infringement thereof since August 1, 1961.

## INTERLOCUTORY JUDGMENT

This cause having come on to be heard on the pleadings, evidence and briefs of counsel and this Court having been fully advised in the premises and having filed its written opinion, which as ordered by appropriate entry on the Civil Docket of the Court on January 6, 1960, constitutes the findings of fact and conclusions of law in accordance with Rule 52(a) of The Federal Rules of Civil Procedure, and upon the supplemental pleadings filed pursuant to this Court's Order of March 24, 1960 and the supplemental findings of fact and conclusions of law made by this Court upon said supplemental pleadings in further compliance with said Rule 52(a), it is hereby

Ordered, adjudged and decreed that:

1. This Court has jurisdiction of the parties and of the subject matter of the suit except for plaintiff's non-federal cause of action of unfair competition against defendant.

2. Plaintiff, Preformed Line Products Company, is and has been since commencement of this action, the lawful owner of the entire right, title and interest in and to United States Letters Patent No. 2,609,653 (known as Patent No. 3) and United States Letters Patent No. 2,761,273 (known as Patent No. 4).

3. Patent No. 2,609,653 (Patent No. 3) is invalid as to both claims thereof, and plaintiff's claim of infringement thereof is dismissed on the ground that said patent is invalid and upon the further ground that, if said patent be considered valid, defendant has an implied license to make, use and sell the reinforcements defined by said patent and plaintiff is estopped to enforce said patent against defendant.

4. Patent No. 2,761,273 (Patent No. 4) is valid and has been infringed by defendant as to claims 1, 3, 5, 6, 8, 9, 10, 11, 12, 13, 14 and 15 thereof by its manufacture, use and sale of helically shaped dead ends, but plaintiff has misused this patent in that plaintiff had been illegally tying the sale of armor rods with the sale of dead ends manufactured under Patent No. 2,761,273 (Patent No. 4) in violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14; no affirmative steps were taken by plaintiff to renounce such improper practices until after the filing of the Court's Opinion and findings of fact and conclusions of law on January 6, 1960, and by reason thereof plaintiff was on that date disentitled to any relief herein.

5. Commencing on January 12, 1960, plaintiff acted affirmatively to purge itself of its misuse of Patent No. 2,761,273 (Patent No. 4), and completed its purge of such misuse on or before June 15, 1961.

6. After June 15, 1961, plaintiff remained disentitled to any relief herein by reason of its misleading references to Patent No. 2,609,653 (Patent No. 3) in quotations to customers contrary to the determination of this Court on January 6, 1960 until such misleading references were terminated and corrected by adequate notice to all persons interested during the month of July, 1961.

7. Effective August 1, 1961, plaintiff became entitled to relief against defend-

ant's infringement of Patent No. 2,761,-273 (Patent No. 4).

8. Defendant, The Fanner Manufacturing Company, its officers, agents, servants, employees, attorneys, successors and assigns and all those controlling defendant, in privity, active concert or participation with defendant or controlled by defendant, or any thereof, are permanently enjoined and restrained from directly or indirectly making or causing to be made, using or causing to be used, selling or causing to be sold articles embodying or made by using the invention or inventions embraced or covered by claims 1, 3, 5, 6, 8, 9, 10, 11, 12, 13, 14 and 15 of Patent No. 2,761,273 (Patent No. 4) and from infringing upon said claims of said patent in any wise whatsoever and in any way directly or indirectly contributing to the infringement of said patent by others.

9. Plaintiff shall recover from defendant damages adequate to compensate plaintiff for defendant's infringement of Patent No. 2,761,273 (Patent No. 4) since August 1, 1961.

10. Upon application of plaintiff, this case shall be referred to a Special Master of this Court to take evidence and ascertain and report to the Court without delay an account of the damages adequate to compensate plaintiff for defendant's infringement of Patent No. 2,-761,273 (Patent No. 4) since August 1, 1961.

11. The relief hereinabove granted to plaintiff by way of injunction and accounting shall be dependent upon the plaintiff's conducting its business and using its Patent No. 2,609,653 (Patent No. 3) and Patent No. 2,761,273 (Patent No. 4) without unlawfully attempting to employ said patent, or either of them, to create a limited monopoly on unpatented materials, and leave is hereby reserved to defendant to make application to the Court to vacate or modify this judgment upon a showing that the plaintiff or any of its representatives, whether they be executive officers of the plaintiff or merely plaintiff's sales representatives, is or are unlawfully conducting plaintiff's business and using Patent No. 2,609,653 (Patent No. 3) or Patent No. 2,761,273 (Patent No. 4) in any way to create a limited monopoly on unpatented materials.

12. Defendant has no license, express or implied, under Patent. No. 2,761,273 (Patent No. 4).

13. Plaintiff's claims of unfair competition are dismissed on the ground that this Court lacks jurisdiction to hear and determine such claims. Said dismissal is without prejudice to the prosecution of said claims in a court of competent jurisdiction.

14. Defendant's counterclaim for damages is dismissed.

15. Both parties having prevailed in part, each party shall pay its own costs.

16. Exceptions saved to both parties.